## BURNS v. TWENTIETH CENTURY–FOX FILM CORPORATION.

Civ. No. 7070.

District Court, D. Massachusetts.

Feb. 27, 1948.

Walter R. Morris, of Boston, Mass., for plaintiff.

James C. Reilly, Joseph P. Rooney and Gaston, Snow, Rice & Boyd, all of Boston, Mass., for defendant.

WYZANSKI, District Judge.

This suit is before me on plaintiff's claim of infringement of copyright by defendant. Plaintiff is the author of a novel, Angel

On Horseback, which he wrote between Christmas 1944 and the summer of 1945. He published it on November 7, 1945. He filed with the copyright office an affidavit of publication on January 29, 1946 and copies of his book on February 13, 1946.

Defendant thereafter published a motion picture, Miracle on Thirty-Fourth Street. Plaintiff claims that this publication infringes his copyright.

I find as a fact that the substance of the motion picture was derived from a manuscript which Valentine Davies prepared and submitted to defendant at least as early as July 1945 before plaintiff had finished his book or shown it to any representative of defendant.

I find that there is no credible evidence that at the time of preparing or publishing the motion picture defendant had actual access to or had ever heard of plaintiff's book. For that reason alone plaintiff's suit should be dismissed.

But there is further and convincing evidence that I feel bound to recite in order to save time for a higher court if there should be an appeal which persuades me that even if there has been access, there has been no copying of plaintiff's book. This further evidence is in the plot, atmosphere, character, incidents and dialog of the book and the movie. Neither in whole nor in part, nor in outline nor detail was there any copying as appears from the following summaries of the novel and the movie.

The novel, An Angel on Horseback, is a conventionalized story of a romance between young Doctor James O'Farrell, of Irish Catholic extraction, and Greta Edlund, of Swedish Protestant extraction. The doctor, a San Franciscan, is at the start of the story an interne in a Los Angeles hospital to which for a superficial injury Greta has been brought for treatment. He falls in love with her at first sight but is cautioned by his friend, Dr. Duke, to remember that love may interfere with his professional career. The main theme of the novel is the development of the love story to the happy climax customary in American literature of this genre. Athwart the destined road stand certain obstacles of which the most prominent are the doctor's medical career, the competition of a Lt. Anderson for Greta's hand and the difference of religion between Jimmy and Greta—a barrier overcome at the end by Greta's announcement that she has been secretly converted to the Roman Catholic Church.

To appreciate the scope and atmosphere of the story it is important to state its background. The situs of the novel is in Los Angeles and in surrounding Southern California territory. This gives the author opportunities to describe the good and bad points of the community. There are graphic pictures of the city of Los Angeles itself, its attractive places, such as the Union Station and the Planetarium, the neighborhoods in which minorities live and the countryside as far away as the beautiful cities of Pasedena and Palm Springs and the difficult trails ascending Mt. Wilson. The author includes in the novel his reflections on the mores of the community. He writes of the sophistication of the young, the divorce rate of the mature, the godless teaching in the schools, the to him absurd Republican view that Americans could have two cars in every garage, the to him equally absurd Democratic view that Americans can afford milk for the starving East Europeans, and the social intimacy but differences in outlook between persons of Irish and of Jewish origin. It is against this background (which of course is disclosed not at once but in stages) that the story develops.

On coming from Minnesota to her aunt in Los Angeles, Greta had first sought a moving picture career. She quickly turned to the steadier employment offered in a "better class" retail store, Pollard's on Wilshire Boulevard. The manager, not the owner, is Mr. McNabb, a "screwy looking ape", troubled by ulcers, disagreeable to all the employees, sadistic toward alcoholics and others who are young, timid, or undersized (p. 106), irascible to those in his power, cringing toward customers who complain of salesgirls and possessed of illusions as to his powers of detection. Among the store employees are the pleasant companion of Greta's office, Ann Thomas, and two men in the men's furnishing department, who go by the nicknames "Profit" and "Loss." The former's real name is "Bill" Henry, and he is the more interesting since

his waggish pranks and his love of humor, dancing and liquor as well as his willingness to stand up on occasion to McNabb furnish a comic relief from the main plot.

One day, after Greta has been employed in Pollard's, she goes out horseback riding. Her horse is struck by a golf ball hit by one of the foursome in which Jimmy O'-Farrell is playing. This serves as a further impetus to the romance and gives the novel its title, "An Angel on Horseback." Scenes which follow at various intervals and which need not be set forth now in correct sequence show O'Farrell borrowing a friend's Buick, calling on Greta and her aunt, learning of a supposed rival, Lt. Anderson, taking Greta to the neighborhood of the Planetarium and eventually kissing Greta.

In the middle of the course of true love occurs the passage at pages 68-74 on which this suit is principally founded. Pollard's a few weeks before Christmas arranged to have a temporary toy department and engaged a number of temporary employees including a man to act as Santa Claus. The Santa Claus and the salesman, Profit, start drinking while they are at work. They constantly increase their degree of intoxication by retiring at frequent intervals to the men's room "to brush their teeth." After imbibing to excess, Santa asks Greta to sit on his knee and simultaneously inquires what she wants. She to quiet him asks for a new typewriter and a horse to ride. Santa says she has the prettiest eyes. Eventually he lets her hand go and thus releases Greta for her job. Shortly afterwards Profit starts to play "catch" by throwing footballs to boys. Then both Santa and Profit distribute toys free to children in the store. As the author says, "The toy department, a temporary one, was set up primarily by 'Pollard's', as a service to the dear little kiddies, not as a sales promotion for profit, dear no, after all Christmas did belong to the children, didn't Pollard's say so in their institutional publicity?" (p. 71) Suddenly McNabb and the display manager learn in a general way of the goings-on. Greta to prevent McNabb from discovering Profit's participation, notifies Mr. Earle of the furnishing department to get Profit out of the

way. Profit escapes from the store in Santa's suit; McNabb fires the drunken Santa.

There are some other department store scenes later in the book, but no serious charge of infringement of copyright rests upon them.

In one of those scenes a Latin-American gigolo, Carlos Alfonso, selects a large assortment of merchandise which Profit as salesman offers him. Profit, anxious for the salesman's commission assures Alfonso he can continue his purchasing confident that his automobile will not be tagged by the police while it is stationed on the Wilshire Boulevard or that if it is tagged McNabb will fix it up with the police. The car is tagged and McNabb is put out with Profit for getting him involved, but McNabb does not discharge Profit.

In another scene an over-diligent salesman seeing a customer leave Pollard's with suits over his arm starts to chase him and in the scuffle a store window at Pollard's is broken. The hue and cry turns out to have been founded on error—the customer was in fact taking out to his car unboxed clothing which he had lawfully purchased.

Aside from these department store episodes which are distinctly subsidiary and of no more significance to the main plot than, for example, Jimmy's successful encounter with a prowling burglar or his several successful hospital cases, the main thread of the story is concerned with the romance between Greta and Jimmy which, following the drunken Santa Claus incident, continues for more than 160 pages of the 234 page novel. At times Jimmy and Greta go horseback riding, automobiling, visiting the seashore and playing golf. Telephone calls are exchanged between the couple when Jimmy is out of town. When they are reunited they go mountain climbing. There is almost a disaster when Greta loses her footing. But the skill of Jimmy and Greta's own courage avoid the dire consequences which have been dangled before the reader's eyes. There are times when Dr. Duke tries to persuade Jimmy to give up Greta and there are times when Greta out of love toward Jimmy says she will marry Lt. Anderson.

Finally Jimmy enters the Navy as a lieutenant and goes to San Francisco. There he meets Greta. He learns of her conversion to Catholicism. As the book comes to an end their marriage is in plain sight.

The motion picture, The Miracle on 34th Street, is a fantasy rather than a romance. Its central character is an elderly bearded man who is or has the illusion that he is Santa Claus and whose aim is to reawaken the faith of mankind in Santa Claus and to restore the generous and fraternal Christmas spirit of yore instead of the commercial and profit-seeking Christmas methods supposed to have recently come into vogue.

The locale of the motion picture is New York City; the season, the five weeks from Thanksgiving Day through Christmas Day. On Thanksgiving Day, the traditional date on which the well-known department store R. H. Macy Co. conducts in New York City a parade of Santa Claus, clowns, giants and other figures from fairyland, Kris Kringle, a kindly bearded man begins his day by walking along Madison Avenue, New York City. He sees a retail store clerk arranging a display window. He tells the clerk that he has not correctly arranged in his display the small wooden figures of Santa Claus and his reindeer. Then Kris Kringle crosses to Central Park. He discovers that the man designated to act the role of Santa Claus is unable to raise his whip properly because he is intoxicated. He rushes to inform Mrs. Doris Walker, who is the Macy executive in charge of the parade that "your Santa Claus is intoxicated." She asks if he could be Santa Claus and help them out. He replies that while he is not in the habit of substituting for spurious Santa Clauses, he agrees to do it this time. And as Santa Claus off he rides on a float as the master of the parade.

His splendid performance is observed from a window of a central Park West apartment by Mrs. Walker's daughter, Susan, who is sitting with a neighbor across the way from Mrs. Walker, a young, attractive, junior associate of a law firm. This man, Fred Gailey, it develops, had wanted for some time to meet the attractive, young Mrs. Walker, a divorcee. Several times he had taken out her daughter, a child in the second grade of a progressive school,

as a means of ultimately meeting Mrs. Walker. Mrs. Walker's colored cook, Cleo, had allowed him to do this. On this occasion the daughter, Susan, tells Gailey that she does not believe in Santa Claus. In that and other ways she then and later reveals herself as a child brought up in ignorance of fairy tales and other forms of fantasy. While Gailey and Susan are talking, her mother returns and fulfilling a pre-arranged plan with Gailey, Susan gets her mother to invite him to a late afternoon Thanksgiving dinner.

In the meantime the performance of Kris Kringle had made his qualities as a "born salesman" evident to one of Mrs. Walker's associates, Mr. Shellhammer. He and she decide to hire Kris Kringle as a Santa Claus for the sales force of Macy's during the Christmas period. Kris Kringle accepts and on going to work puts on a magnificent Santa Claus costume. As he is doing this he talks with a young boy, Alfred, who sweeps up the locker room and who says that in his off hours he acts as Santa Claus at the Brooklyn "Y." At this juncture Shellhammer comes along. He urges Kris Kringle to push the sale of those toys which Macy's has overstocked, and when a child is undecided as to his preference, to press the purchase of an overstocked toy. Shellhammer departs. Kris Kringle tells Alfred that this is the sort of thing he's been fighting for years—the way they commercialize Christmas. Alfred agrees that even in Brooklyn the spirit has become "make a buck; make a buck." Kringle tears up the list on which Shellhammer has cataloged the overstocked toys.

Kris Kringle then goes on the floor of Macy's to act as host in the toy department. One of the first children who approaches wants a fire engine to play with in the yard but not on the street. His mother whispers to Kris Kringle that he should dissuade the child because she has not been able to find such a gift. Ignoring the mother, Kris Kringle promises the child the fire engine. The mother is very angry until Kris Kringle tells her she can get just the fire engine she wants for $8.50 at Schoenfeld's store. The woman is flabbergasted that a salesperson at Macy's recommends another store. "I don't get it" she says. But she is so pleased she

congratulates Kringle's superior, Shellhammer. Kris Kringle keeps following the same course of conduct with other customers. For example, he sends to Gimbels' a child who needs better skates than Macy's sells.

This sort of behavior excites the admiration of many customers. They flock to Shellhammer's office to express their approval of Macy's putting the spirit of Christmas ahead of commercial advantage. Shellhammer is concerned whether Mr. Macy will also be thankful.

At about this time Gailey, having taken over Cleo's charge, brings Susan to Macy's store. She at first thinks the notion of Kris Kringle is awfully silly. She doesn't believe in him. Gailey gets her to approach Kris Kringle. She pulls his beard and is surprised to find it does not come off. Just then her mother appears. She upbraids Gailey for creating a mental conflict in Susy, and leading her to expect an impossible Prince Charming instead of a real man. To this Gailey replies that they are talking about Susy and not about her.

Kris Kringle continues to greet the children in the store. He has a particularly happy experience in talking Dutch to a refugee child adopted by Americans after her natural parents were killed in the bombing of Rotterdam. Suddenly Kris Kringle is called away by Mrs. Walker. She wants Kris Kringle to assure Susy that there is no such thing as Santa Claus and that he is not really Santa Claus. Far from doing this Kris Kringle continues to carry on his role. Angered, Mrs. Walker sends for his employment card. To her amazement she finds that in filling out his personnel form Kris Kringle showed his name as Kris Kringle, his age as being not quite "so old as his teeth", his association as being with reindeer and his home as being the Brooks Memorial Home for the Aged in Great Neck, Long Island. Alarmed Mrs. Walker decides she must make a change and she tells Kris Kringle that the Macy Santa Claus of two years ago has returned and must be given the job. Just then Mr. Macy sends for Mrs. Walker. He tells her, Mr. Shellhammer and the other assembled executives that this program of Kris Kringle's in diverting customers to the stores where they can get their wants best satisfied has had a tremendous public response. Mr. Macy says that the program on its face sounds idiotic but one can't argue with success; it is a merchandising policy which should be expanded over the entire store so that the store will be known as the helpful store which puts service ahead of profit. Mr. Macy also promises that in the Christmas envelopes there will be a practical expression of the store's gratitude to Mrs. Walker, Mr. Shellhammer and Kris Kringle.

Dumfounded, Mrs. Walker returns to tell Kris Kringle he must remain as Santa Claus and another job will be found for the old Macy Santa Claus. However, to be on the safe side, Mrs. Walker decides to ask Kris Kringle to see the store psychologist, Mr. Sawyer, for an intelligence test. Sawyer is a nervous, irascible man who has a tick of constantly twisting his eyebrows. Kris Kringle reports to Sawyer's office and readily passes simple intelligence and muscular co-ordination tests. Kringle goes further, however, and suggests to the infuriated Sawyer that he, Sawyer, is insecure and inquires whether he is happy at home. Sawyer indignantly replies that he has been happily married for 26 years. Hardly has Kringle left when Mrs. Sawyer calls Sawyer and over the telephone they wrangle about money matters and about her brother.

Next, in response to a telephone call from Mrs. Walker, Dr. Brooks, the physician in charge of the Brooks Memorial Home, comes to the store and tells the executives that it is his considered opinion that Kris Kringle should not be incarcerated or dismissed. His delusion, in Dr. Pierce's opinion, is a harmless delusion for good.

However, Sawyer persists in his view that Kris Kringle's whole manner suggests aggressiveness and indicates maniacal tendencies. If anything occurs he says the responsibility will be Mrs. Walker's.

To lessen the chance of an overt incident Mrs. Walker and Mr. Shellhammer agree that Kris Kringle ought to be spared the travel back and forth from Great Neck to Macy's. The plan is that Mr. and Mrs. Shellhammer shall put him up in their house. Until Mr. Shellhammer can persuade his wife—after a double cocktail—

Mrs. Walker is to take Kris Kringle to her apartment. She does so. Kris Kringle entertains Susy and induces her to imagine herself as a monkey. This awakening of the child's imaginative spirit kindles a sympathetic chord in Gailey who is a dinner guest. He decides to ask Kringle to stay in his apartment. Kringle accepts. Kringle says good-night to the bubble-gum-chewing Susy and learns that her secret wish is to live in the country in a Cape Cod cottage. She tells Kringle that her belief in Santa Claus will turn on whether he can produce such a house.

Gimbels' retail store has in the meantime learned of Kringle's success. Their executives decide to copy Macy's. In an almost fraternal spirit executives of the two stores are photographed with Kringle at Macy's. He receives from Mr. Macy a check large enough to buy an X-ray machine for Dr. Pierce.

Kringle goes to the cafeteria for lunch. He sits with Alfred. From him he learns that the boy is being psychoanalyzed daily by Sawyer who has told him that playing Santa Claus at the "Y" indicates that Alfred has a guilt complex and has a hitherto secret hate of his father. Outraged at the abuse of the boy Kringle goes to Sawyer's office and hits him over the head with a cane. Sawyer revives quickly enough to see that Mrs. Walker and Mr. Shellhammer are in the corridor. He tells them that Kringle must be locked up at Bellevue and that Sawyer will arrange it. Under the mistaken belief he is going to see the Mayor of New York, Kringle is taken to Bellevue. There, feeling that Mrs. Walker has let him down and lost confidence in him, Kringle deliberately fails to pass simple tests and is locked up.

The District Attorney goes to Judge Henry Harper of the New York Supreme Court to get a commitment. Just as Harper is about to execute the papers as a routine matter the judge learns that the matter has complications. So he sets the case of Kringle's sanity for hearing. Gailey decides to act as counsel for Kringle. His senior associates make him resign from his law firm. He goes ahead seeking to win his case both by newspaper publicity and forensic skill.

A politician, Charlie, tries to induce Judge Harper to go on vacation and not to hear a case involving the question whether Santa Claus is a real person. He points out that Harper is up for re-election and that the question is complicated. Indeed at a later stage Charlie observes that an adverse decision will affect all types of business, labor and commercial interests. Harper refuses to budge, though his grandchildren shun him when they hear he is doubtful of the reality of Santa Claus. Later when the trial opens and the prosecutor has an almost equally hostile press, he receives an unsympathetic reception from his wife who regards him as sadistic.

In the meantime there are the first of the several scenes of courtroom hearings which last until Christmas eve. On examination by the District Attorney Kringle says he does believe he is Santa Claus. On that evidence the prosecutor—or, as he perhaps ought to be called, proponent or petitioner—rests. In meeting the prosecution's case, Gailey calls to the stand first Mr. Macy who states he believes Kringle to be Santa Claus and then the prosecutor's son who also believes in Santa Claus largely because his father told him there was such a person and because he expects a Christmas present. The prosecution then concedes that Santa Claus exists.

In the judge's chambers the politician, Charlie, keeps pointing out the dangers of a judicial decision. Harper, J. persists. Back in court he rules that he wants authoritative evidence that this Kringle is Santa Claus. The chance for identification comes when Susy writes to the courthouse a letter addressed to Kringle with a postscript from Mrs. Walker. In sorting the mail and directing Susy's letter to the courthouse, a postal clerk conceives the idea of sending Kringle the fifty thousand letters addressed to Santa Claus which the post-office has been holding as dead letters. The letters are delivered in court to Kringle, are put in sacks on the bench and are accepted by the judge as evidence that an agency of the United States government recognizes Kringle as the genuine Santa Claus. Judgment is entered releasing Kringle.

A Christmas celebration party is held at the Brooks Home. Officiating as senior and

junior Santa Claus are Kringle and his assistant Alfred. In attendance are many of the principal characters including Mr. Macy. All except Susy receive presents. She dashes to the Christmas tree in the hope of finding there the promised Cape Cod cottage. It isn't there. Kringle tells Mrs. Walker, Gailey and Susy the road they must follow driving home. They pass a Cape Cod cottage. Susy tells Gailey to stop. He does. She runs to the cottage and says it is the one she has been promised. Gailey and her mother kiss each other, recall that the house is for sale and impliedly decide to marry and set up house for Susy. Mrs. Walker says she never doubted Gailey. He says in the sanity case he did little more than prove a legal technicality. Just then he sees in the corner of the Cape Cod cottage Kringle's cane and he stops to wonder whether Kringle wasn't really Santa and hadn't been the guiding spirit all the time. The picture comes to a close.

The foregoing account of the novel and the movie hardly requires analysis to show the lack of a scintilla of the type of resemblance that gives rise to liability.

To be sure, both the novel and the movie have references to a Christmas season in a retail store. Both refer to store sales policies of pushing merchandise that was in one case old, and in the other overstocked. The book mentions institutional advertising and I suppose a parade might be regarded as institutional advertising. Both have scenes in which the mythical character of Santa Claus displays his familiar traits of benevolence, kindness to children and a Christmas spirit. Both have an intoxicated Santa Claus—though in the movie the first intoxicated Santa Claus is a mere device to lead on to the center of the stage a second Santa Claus who is the leading character and who reproves the inebriated Santa for his appetite for liquor. Both have department store officials who are irascible toward the weak and young—though the manager McNabb is in all other respects a fellow quite different from the fidgety psychologist Sawyer.

These supposedly common aspects would not even support a charge of plagiarism if they occupied the center of plaintiff's book or of defendant's movie. Santa Clauses who are benevolent, though drunk (or because they are drunk) are common characters in moving pictures dealing with retail stores. One such cinema produced about 1941 was called Life Begins At Eight-Thirty. And irascible executives like irascible judges are unfortunately a familiar phenomenon belonging to the general domain of knowledge. Only sharp etchings of particular persons create the type of character that can be the subject of a successful plagiarism suit. Plaintiff's Santa Claus and plaintiff's McNabb entirely lack the necessary individualization. They remain more types so loosely sketched as not to be reduced to the possession of any author—or indeed any reader.

Moreover, in the case at bar plaintiff's novel is a romantic tale, not without interest and excitement at times, but entirely without the whimsy that gives the movie its spirit of gaiety. It is in its entirety far removed from defendant's production, and defendant's is removed from plaintiff's. One judge—though an imaginary one, Harper J.—learned nearly to his cost that fantasy must be sharply distinguished from other types of thought. And the present judge in the case at bar profiting from Judge Harper's lesson cannot find that defendant's excursion into the never never world of Peter Pan invaded one inch of the territory of the real world portrayed by plaintiff's book.

▮▮▮▮ In conclusion I ought to add that I cannot suppose that on a case so plain as this I would have been justified in pausing to hear the literary agents, newspaper men and instructors in dramatics called by plaintiff to give their so-called expert opinion on defendant's alleged infringement of plaintiff's copyright. I am glad to concur in the most emphatic way in Judge Learned Hand's observation in Nichols v. Universal Pictures Corporation, 2 Cir., 45 F.2d 119, 123 to the effect that: "We cannot approve the length of the record, which was due chiefly to the use of expert witnesses. Argument is argument whether in the box or at the bar, and its proper place is the last. The testimony of an expert upon such issues, especially his cross-examination, greatly extends the trial and contributes nothing which cannot be better heard after

the evidence is all submitted. It ought not to be allowed at all; and while its admission is not a ground for reversal, it cumbers the case and tends to confusion for the more the court is led into the intricacies of dramatic craftsmanship, the less likely it is to stand upon the firmer, if more naive, ground of its considered impressions upon its own perusal. We hope that in this class of cases such evidence may in the future be entirely excluded, and the case confined to the actual issues; that is, whether the copyrighted work was original, and whether the defendant copied it, so far as the supposed infringement is identical.

"The defendant, 'the prevailing party,' was entitled to a reasonable attorney's fee (section 40 of the Copyright Act [17 U.S.C.A. § 40])."

Judgment for defendants with costs and an attorney's fee of $250.