**Edna BUCKLER, Plaintiff,**

v.

**PARAMOUNT PICTURES, Inc.,
Defendant.**

United States District Court
S. D. New York.·
Aug. 2, 1955.

Schneider & Fazio, New York City, for plaintiff.

Louis Phillips, New York City, Bernard E. Kalman, of counsel, for defendant.

PALMIERI, District Judge.

The defendant has moved, pursuant to Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A.., for summary judgment dismissing the complaint. The plaintiff has alleged two causes of action involving substantially the same facts. The first cause of action is based on copyright infringement and the second cause of action upon the alleged misappropriation of literary material. The plaintiff claims substantial damages as the result of the defendant's production and exhibition of a highly successful motion picture entitled "Sunset Boulevard." The plaintiff is the author and copright owner of a play entitled "The Fifth Freedom" which was never published in printed form and which had a total of three consecutive performances at a summer theatre in New Hampshire.

The defendant has admitted corporate access but has denied any access by the authors of the screenplay. The defendant's papers contain affidavits by the three authors to the effect that they never read or heard of the plaintiff's work.

Upon the argument counsel for both sides agreed that the issue of similarity between the plaintiff's play and the defendant's motion picture was the sole and determinative issue upon this motion and that the plaintiff cannot maintain this action if she fails to show that there is a genuine issue with respect to her claim of similarity. See also Shipman v. R. K. O. Radio Pictures, Inc., 2 Cir., 1938, 100 F.2d 533, affirming D.C. S.D.N.Y.1937, 20 F.Supp. 249; Ornstein v. Paramount Productions, Inc., D.C.S.D. N.Y.1935, 9 F.Supp. 896, and Caruthers v. R. K. O. Radio Pictures, Inc., D.C.S.D. N.Y.1937, 20 F.Supp. 906.

I have read the script of the plaintiff's play. I have also witnessed an exhibition of the motion picture in the presence of counsel for both sides.

It is my opinion that the motion picture does not infringe the plaintiff's play, and that it is so dissimilar from the play in every important respect, that is, as to stories, plots, characters, incidents, scenes and dialogues, that there is no genuine issue of fact as to similarity and therefore no reason for putting the defendant to the expense of a trial, or for passing upon other issues.

The defendant's motion picture concerns a motion picture actress who lives amid her delusions of grandeur and fame. She was successful in the days of silent motion pictures but is now forgotten and unemployed. She is convinced, however, that she is still beautiful and famous. Her illusions are largely sustained through the devices of her devoted butler-chauffeur who was the first of her several husbands. He is the only other occupant of her large, pretentious and somewhat run down residence on Sunset Boulevard in Los Angeles. The first scene of the motion picture shows the arrival of policemen in the early morning hours at the swimming pool of the residence where they find the fully clothed body of a young man floating face downward in the swimming pool. The thread of the story is then taken up at its beginning, six months before, when the young man, a financially hard-pressed movie writer named Joe Gillis, is seeking to save his car from being repossessed by the agents of a finance company. The matter of keeping the automobile is one of the first importance to Joe Gillis and he resorts to a series of stratagems to retain it despite his inability to earn or borrow the money to pay for it. Quite by accident, and following an automobile chase by the finance company agents, Joe Gillis finds himself in the driveway of the home on Sunset Boulevard. This leads to his association with the former movie star, Norma Desmond. Joe Gillis stays there because he finds it convenient for his food and shelter and also because he has the hope of doing some remunerative work as a writer. Joe soon realizes, however, that although he has been given expensive clothing and presents by Norma Desmond, he is not earning a salary. The seclusion from his friends, the over-protectiveness of Norma Desmond, the realization that she is in love with him and jealous of him, make him increasingly unhappy and lead him to seek out friends of his own age and interests. Among them is Betty, an attractive young woman full of health and vitality who has faith in Joe Gillis' ability as a writer. Joe manages to steal away from the house at Sunset Boulevard and to work with Betty at a studio office on a story that they both believe has hope of success. What should have been a happy love story for Betty and Joe is tarnished by another of Norma Desmond's suicide attempts, by her sinister interference in Betty's friendship with Joe and finally by her murder of Joe. In the closing scenes of the motion picture, Joe Gillis is determined to leave the once famous actress, and smarting from the humiliation of her words to Betty as to "how he lived," and "where he lived," tells her that she is a decrepit old woman and worthless as an actress. Norma Desmond then acts like one who is completely deranged. She calls after Joe and follows him as he leaves the mansion. At the edge of the swimming pool, she shoots him and, after the third shot, he falls face downwards into the pool. In the final scene, Norma Desmond believes that she is about to play before the cameras again for her new motion picture and, oblivious to the fact that she is surrounded by the police and by newspaper reporters and cameramen, and following the directions of her ever devoted manservant and former husband, who mimics the role of a film director for the occasion, she descends the stairway of her mansion in the stilted fashion of the silent movie stars. She has no realization of her imminent arrest for murder.

The plaintiff's play involves, as its principal character, a woman of unusual talents who chooses to live in seclusion in her Long Island home so long as her millionaire soldier fiance is fighting overseas. She is identified as a draftsman of noted legislation and state documents such as the legislation popularly known as the "G. I. Bill of Rights" and the League of Nations Charter. The plaintiff has described her play as one of spiritual and political import and based upon incidents in her own life. On being asked on her deposition what she meant by the expression "The Fifth Freedom," she replied: "The freedom of soul from sin, through divine love." The script contains many allusions to the

Bible and to concepts of love, religion, patriotism, government and democracy. There are a number of occasions when the continuity of the story appears to be rudely interrupted by these allusions. The characters appear to turn their backs on the story of the play for the sake of making a religious or patriotic speech to the audience. Thalia, the secluded lady of the play, carries on some mysterious business in her room with an apparently important person who turns out to be a personal representative of the President of the United States. In one of the closing lines of the play this personage, whose name is Eagle, says to Thalia: "He (the President) has asked me to have you reconsider your refusal to accept public recognition for the great service you have given our country." Thalia replies: "O, will you thank His Excellency, the President of the United States of America, and tell him I feel that the cause is greater than any personal recognition * * * There are so many who hate me and if they knew of my interest, they might try to retard our progress."

The entire play takes place in the living room of Thalia's house. She allows her neighbors to use the ballroom for charity functions and Red Cross dances. She, herself, never puts in an appearance even though her life-long companion and housekeeper, Trota, feels that Thalia is throwing her youth away. But Thalia will not be disloyal to her fiance, Courtney, who is overseas. Trota, meanwhile, has fallen into the hands of a swindler, blackmailer and poisoner named Lonergon. Courtney, having suspected Thalia's need for money, has been sending it to her through Trota. This is the money obtained by Lonergon through swindle and blackmail. Adam, a young man out of college, who turns out to be an agent of the Federal Bureau of Investigation, seeks permission to use the ballroom for a Red Cross benefit dance. Courtney arrives on the scene unexpectedly on the eve of the dance, quarrels with Thalia over her apparent ingratitude in not thanking him for the money

which he has been sending, and they decide to part—much to the relief of Trota who wishes to avoid any accounting for the funds out of which she has been swindled by Lonergon. Lonergon, however, takes a dim view of the lovers' parting because there will be no more money forthcoming. So he decides, since Trota is the sole beneficiary in Thalia's will, to blackmail Trota into killing Thalia by the use of slow poison disguised as vitamin pills. During the Red Cross dance there is a flirtation between Thalia and Adam, the dance is invaded by a group of local toughs who wish to punish Thalia on the ground that she is a fifth columnist and Thalia acquits herself of an impassioned, patriotic speech. The toughs withdraw and for unexplained reasons Thalia has Adam analyze the pills Trota has given her. Adam reveals himself to Trota as an F.B.I. agent. The pills are found to be harmless since Trota has not used those Lonergon gave her. Everybody forgives and understands everybody else, including Courtney, who comes back to beg Thalia's pardon for his stupidity—except, of course, Lonergon who is arrested and taken away by Adam. The play ends with the ever-recurring lines of the reconciled lovers: Courtney: "Good lord, Thalia..what a fool I've been. Can we begin again?" Thalia: "We can try..Oh, my darling..it's worth a try!"

The characters in the defendant's motion picture and the plaintiff's play are totally dissimilar. Norma Desmond is divorced from reality and lives upon the illusions of her popularity and her beauty. Thalia is a gifted and active person who uses her chosen seclusion for the purpose of writing and making presumably important contributions to her country. She possesses a vast and articulate concern for the interests of society and she is self-sacrificing, patriotic, and deeply religious. Norma Desmond possesses none of these characteristics. Each one of these ladies has a domestic servant and each one falls in love with a younger man. There is nothing new or unusual about that. The devoted ex-hus-

band, chauffeur-butler of Norma Desmond in the motion picture is very different from the weak, check-forging maid-housekeeper of Thalia. Joe Gillis, the impecunious writer in the motion picture never falls in love with the elderly former screen actress but Adam, the F.B.I. agent, does lose his heart to Thalia. Finally, Joe is killed by the irate and insane actress whereas Adam lives happily ever after.

There is no similarity in locale since the motion picture is steeped in the local color of Hollywood, with well known and typical places usually associated with Hollywood, including the lots of Paramount Studio, whereas the plaintiff's play takes place entirely in Thalia's Long Island home. While the plaintiff's play could have taken place anywhere in the United States in wartime, the defendant's motion picture was essentially bound up with the atmosphere of Hollywood.

It is unnecessary for me to say anything concerning the dialogue since the plaintiff herself disclaims similarity in dialogue in her deposition. I would have no difficulty in reaching the conclusion, apart from this, that the dialogues are very dissimilar both in style and continuity.

I have been unable to find any similarity in incidents or in scenes. As an example of what the plaintiff claims to be similarity in this respect, she has pointed to the reference by Joe Gillis to "the wax works." This is a reference to the retired actors who sometimes played bridge with Norma Desmond. The plaintiff has compared the bridge game scene in the motion picture with the scene in her play in which Thalia listens to old phonograph records. Plaintiff has sought to establish a basis for comparison on the ground that these old records are equivalent to "old stars, in wax, on the records." I consider this contention extremely farfetched. The plaintiff has also pointed to a similarity between the burial of a pet monkey in the motion picture and the phrase used at one point in the play: "He made a monkey of himself." It would strain credulity to believe that any such claim of similarity is valid.

It is significant that when the plaintiff first wrote to the defendant, after having seen the defendant's motion picture, she made no claim of plagiarism but commented on the fine quality of the performance of Miss Gloria Swanson, who played the role of Norma Desmond; and in the same letter she offered to sell her motion picture rights to "The Fifth Freedom" without making the slightest allusion to any claim of similarity. In a later letter, the plaintiff offered to drop her claim involving the defendant's motion picture if the defendant would purchase another script she had written.

It is my conclusion, therefore, that there is no genuine issue of fact with respect to the claim of similarity between the defendant's motion picture, "Sunset Boulevard," and the plaintiff's play, "The Fifth Freedom," and that judgment should be entered in favor of the defendant dismissing the complaint on both causes of action.