Dona B. COSTELLO, otherwise known as Mary A. Costello, Plaintiff,

v.

LOEW'S INCORPORATED, otherwise known as Metro-Goldwyn-Mayer Pictures, Defendant.

Civ. A. 3433–55.

United States District Court District of Columbia.

Feb. 19, 1958.

A. Yates Dowell, A. Yates Dowell, Jr., Robert H. McNeill, Washington, D. C., for plaintiff.

James F. Reilly, Washington, D. C., (William J. Hughes, Jr., Washington, D. C., Benjamin I. Melniker, Joseph A. Macchia, New York City, of counsel), for defendant.

KEECH, District Judge.

The plaintiff in this action, Dona B. Costello, seeks damages from the defendant, Loew's Incorporated, otherwise known as Metro-Goldwyn-Mayer Pictures (M-G-M), in Count 1 for alleged infringement of her copyrighted drama The Sangreal by the defendant's motion picture Knights of the Round Table and in Count 2 for common-law misappropriation in defendant's motion picture of an uncopyrighted scenario based upon her drama. The case is before the court on the defendant's motion for summary judgment. The court has heard extensive argument on the motion by respective counsel, who are agreed upon the applicable principles of law, but take widely divergent positions as to the application of those principles to the facts in the instant case.

It is agreed that to recover for either copyright infringement or common-law misappropriation of literary property the plaintiff must prove (1) access;[1] (2) substantial similarities between the two works;[2] and (3) copying of the plaintiff's work by the defendant.[3]

Inasmuch as the defendant admits corporate access to the plaintiff's work in 1934 and 1935, it is unnecessary to discuss the law concerning proof of that element.

Counsel are agreed that for infringement or misappropriation there must be substantial similarities between the two works;[4] that those similarities must relate to copyrightable portions of plaintiff's work;[5] and that it is the original intellectual product of an author which is protected by copyright or may be the subject of common-law misappropriation.[6]

There is no dispute that, although matters in the public domain may not be copyrighted, it is not necessary, for an author to be protected, that all the elements of his literary work be original.[7]

1. Arnstein v. Porter, 2 Cir., 1946, 154 F. 2d 464; Twentieth Century-Fox Film Corp. v. Dieckhaus, 8 Cir., 1946, 153 F. 2d 893, certiorari denied 329 U.S. 716, 67 S.Ct. 46, 91 L.Ed. 621.

2. Heim v. Universal Pictures Co., 2 Cir., 1946, 154 F.2d 480; Kustoff v. Chaplin, 9 Cir., 1941, 120 F.2d 551; Dymow v. Bolton, 2 Cir., 1926, 11 F.2d 690.

3. Mazer v. Stein, 1954, 347 U.S. 201, 218, 74 S.Ct. 460, 98 L.Ed. 630.

4. Miner v. Employers Mutual Liability Ins. Co. of Wis., 1956, 97 U.S.App.D.C. 152, 229 F.2d 35; Carr v. National Capital Press, 1934, 63 App.D.C. 210, 71 F. 2d 220.

5. Harold Lloyd Corp. v. Witwer, 9 Cir., 1933, 65 F.2d 1, 19; Annotation, 23 A.L.R.2d 341.

6. Id.

7. Sheldon v. Metro-Goldwyn-Mayer Pictures Corp., 2 Cir., 1936, 81 F.2d 49, cer-

It is conceded that he may use materials in the public domain to create a new work by adding original material, by conceiving a new combination or novel arrangement of the old elements, or by originating a new theme, plot, characterization, or dialogue.[8]  The protection, however, extends only to his original intellectual product and not to the old public domain elements of which he has made use.[9]

As to the element of copying, counsel are agreed that, while to constitute infringement there need not have been a verbatim copying of plaintiff's work or any part thereof,[10] the appropriation by defendant must have been of a substantial or material part of the protected work,[11] and the alleged copy must come "so near to the original as to give to every person seeing it the idea created by the original."[12]  Copying may be inferred where there has been access and the similarities between the two works are such as to raise a reasonable inference of copying;[13] but the similarity must be recognizable on ordinary observation [14] and the test is not "whether by some hypercritical dissection of sentences and incidents seeming similarities are shown to exist."[15]

Finally, as to the propriety of summary judgment in an infringement action, counsel are agreed that ordinarily plagiarism suits should be tried, similarity, access, and actionable copying being issues of fact for a jury,[16] but that in any type of case the court may grant summary judgment where it is apparent upon the face of the pleadings and other matters of record that there is no genuine and material issue of fact.[17]  A number of cases have been cited to the court which were disposed of by summary judgment, the court finding it apparent on the face of the pleadings and exhibits that no substantial similarity existed between the defendant's work and the protected intellectual product of the plaintiff.[18]

This court has viewed the defendant's motion picture Knights of the Round Table, has read the plaintiff's copyrighted drama, The Sangreal, and the uncopyrighted scenario based thereon, and also has before it the two principal pub-

tiorari denied 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392.

8.  17 U.S.C. § 7; Annotation, 23 A.L.R.2d 264.

9.  Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 1936, 81 F.2d 49, 54, certiorari denied 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392; Harold Lloyd Corp. v. Witwer, 9 Cir., 1933, 65 F.2d 1, 24; McCaleb v. Fox Film Corp., 5 Cir., 1924, 299 F. 48.

10.  Universal Pictures Co. v. Harold Lloyd Corp., 9 Cir., 1947, 162 F.2d 354; Twentieth Century-Fox Film Corp. v. Stonosifer, 9 Cir., 1944, 140 F.2d 579; Nichols v. Universal Pictures Corp., 2 Cir., 1930, 45 F.2d 119, certiorari denied 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795.

11.  See footnote 2.

12.  White-Smith Music Pub. Co. v. Apollo Co., 1908, 209 U.S. 1, 17, 28 S.Ct. 319, 323, 52 L.Ed. 655; Harold Lloyd Corp. v. Witwer, 9 Cir., 1933, 65 F.2d 1, 18.

13.  Arnstein v. Porter, 2 Cir., 1946, 154 F.2d 464, 469; Heim v. Universal Pictures Co., 2 Cir., 1946, 154 F.2d 480, 487;

Christie v. Harris, D.C.N.Y.1942, 47 F. Supp. 39, affirmed 2 Cir., 154 F.2d 827, certiorari denied 329 U.S. 734, 67 S.Ct. 97, 91 L.Ed. 634.

14.  Twentieth Century-Fox Film Corp. v. Stonesifer, 9 Cir., 1944, 140 F.2d 579, 582; Harold Lloyd Corp. v. Witwer, 9 Cir., 1933, 65 F.2d 1, 19; 23 A.L.R.2d 342, et seq.

15.  Funkhouser v. Loew's, Inc., 8 Cir., 1953, 208 F.2d 185, 188, certiorari denied 348 U.S. 843, 75 S.Ct. 64, 99 L.Ed. 664.

16.  Arnstein v. Porter, 2 Cir., 1946, 154 F.2d 464, 474.

17.  Rule 56(b), Fed.Rules Civ.Proc. 28 U.S.C.; Dewey v. Clark, 1950, 86 U.S. App.D.C. 137, 143, 180 F.2d 766.

18.  Millstein v. Leland Hayward, Inc., D.C. S.D.N.Y.1950, 10 F.R.D. 198; Buckler v. Paramount Pictures, D.C.S.D.N.Y. 1955, 133 F.Supp. 223; see also Miner v. Employers Mutual Liability Ins. Co. of Wis., 1956, 97 U.S.App.D.C. 152, 229 F.2d 35.

lic domain sources upon which both plaintiff's and defendant's works concededly were based, Malory's Morte d'Arthur and Tennyson's Idylls of the King. The pleadings filed herein include affidavits by plaintiff and by those who prepared the defendant's motion picture script as to their sources, as well as a detailed analysis by plaintiff of the specific points in which defendant is alleged to have copied her work, together with a 694-page deposition by plaintiff, in which she supplements and further analyzes her claims of infringement.

There is no conflict as to any of the underlying facts in this case. The plaintiff on April 16, 1934, registered with the Register of Copyrights her claim to copyright of The Sangreal, "A play in 5 acts (and 26 scenes) with prologue and epilogue" (Copyright Certificate Class D, unp. No. 27710). On the same date she applied to the Screen Writers' Guild of America for registration of her scenario, based on the play. On May 1, 1934, plaintiff forwarded her scenario and play scripts to the Story Editor of M-G-M, stating she had written them with Ramon Navarro in mind for the part of Sir Galahad and that without him in that part the picture would lose seventy-five percent of its charm and effectiveness. On May 18, 1934, defendant's Story Editor returned the script to plaintiff, rejecting it. In 1935 plaintiff resubmitted her work to the defendant, which on March 1, 1935, again rejected it, returning the manuscript to her agent. There remained in the files of M-G-M the Reader's Report on plaintiff's scenario and playscript, containing a brief summary of The Sangreal dated May 15, 1934,[19] together with a more detailed condensation of plaintiff's work.

19. "Theme:—
"King Arthur and his Round Table—Galahad's quest of the Grail—Lancelot and his love for Guinevere—Modred and Merlin and their plots against the king.
"Synopsis:—
"*Prologue:* Dominic is about to take the final rites of priesthood, and Eloise, who loves him, gives him a copy of the Sangreal. He reads it and he is comforted and strengthened as he is separated from her forever.
"At Camelot, King Arthur has drawn all the lesser rulers about him to form a powerful realm, with the renowned Round Table as the center of English chivalry. At the tournament of the feast of the Pentecost, Galahad, a strange knight, overthrows the mighty Lancelot. That evening he is seated in the Siege Perilous at the Round Table, a place reserved since time immemorial for the Haut Prince. As he reclines in the chair, a vision of the Grail appears, and all the knights decide to go in search of it. Galahad takes the vows of knighthood and goes with them. Due to the hypnotic spell of Merlin, Lancelot remains behind to continue his affair with Queen Guinevere.
"On the way, Galahad leaves the group to befriend Earl Yniol, whose daughter, Blanchefleur, falls in love with her benefactor. Galahad dreams of the Grail, and a voice tells him that only a virgin knight can succeed on the quest. Meanwhile, at Camelot, the traitor Modred has deserted to form a court of his own in the north, composed of heathen and harlot.
"After Sir Mark kills his beautiful wife, Lady Isolt, and her lover, Sir Tristram, in the presence of Lancelot and Guinevere, the queen is brought to a realization of her sin. Later, while Arthur is away, an insane churl brings an obscene message from Modred and repeats it before the court. Guinevere, in her shame, goes to a convent. Lancelot is killed on his way to join Arthur.
"Galahad saves Blanchefleur again, this time from the heathen, but another vision warns him that he must not go to her. She sees him at prayer, and as she, too, is vouchsafed a glimpse of the Sangreal, she knows he will never be her lover, and yet she is comforted. Galahad then helps Arthur overthrow Modred, and also brings Guinevere back to the king.
"After resisting many temptations, and killing the Knights of the Seven Deadly Sins, Galahad frees the Seven Virtuous Maidens, and reaches the Grail.
"*Epilogue:* Eloise, perfectly happy with her husband, and her little son, listens to Dominic as he repeats, at a Mass he conducts, the words of Jesus as He blessed the Chalice at the Last Supper.
"Remarks:—
"Very adequate treatment of the story of the Grail, without noteworthy variation from standard sources such as Malory's Morte d'Arthur. The selection of Mr. Navarro for the part of Galahad is

In 1935, the plaintiff submitted The Sangreal to Paramount Pictures, Inc., which rejected it on February 15, 1935.

The original version of the script for defendant's screenplay, Knights Of The Round Table, dated October 24, 1938, was written by Talbot Jennings under a contract of employment by Paramount. Some time in 1952, defendant M-G-M purchased the Jennings script, which in 1952 and 1953 was cut and revised to final form by M-G-M writers Jan Lustig and Noel Langley. Mr. Jennings' affidavit in support of defendant's motion includes a scene by scene analysis of his script, giving the public domain sources, principally Malory and Tennyson, with specific references to other Arthurian material. The motion picture was released in 1954.

Disregarding the affidavits of defendant's writers as to their source material (which, although uncontradicted, might be considered to raise an issue of credibility), the court finds from its own reading of the plaintiff's drama and scenario, its viewing of the defendant's motion picture, and comparison with the two principal source works, Malory and Tennyson (particularly in the light of the specific claims of infringement by plaintiff in her affidavit and deposition), that there is no similarity between the defendant's picture and the protected, original portions of plaintiff's work, considering them always in the light most favorable to plaintiff's contentions. Obviously, both works are based chiefly on Malory and Tennyson. Both incorporate material carried over with slight variation from the sources. Plaintiff has used much of Tennyson verbatim. Both contain a great deal that has been adapted by the author to suit has own purposes, by way of selection, expansion, condensation, or rearrangement of incidents, substitution of characters, creation of new characterization, or combination of the attributes of several characters found in the source works to form a new character, and interweaving of new material; but the original invention found in the plaintiff's and defendant's works is very different.

Each author has included the two basic story threads found in Malory and Tennyson, the Arthur-Guinevere-Lancelot triangle and the quest of the Holy Grail. Plaintiff's theme, as emphasized by her modern-day prologue and epilogue concerning a young priest, is the renunciation of earthly love in favor of spiritual pursuits, as illustrated by her main story, the renunciation by Galahad, the Grail Knight, of marriage with Blanchefleur, a character created by plaintiff based on old materials.[20] Plaintiff uses the illicit Arthur-Guinevere affair and Modred's enmity for Arthur as background and subordinate plot, in contrast with her Galahad theme. Defendant's motion picture is a tale of adventure in Arthurian costume, suitable for family entertainment, with the pure and hopeless love story of Ava Gardner-Guinevere and Robert Taylor-Lancelot running tandem with the "blood and thunder" plot of King Arthur vs. Morgan Le Fay and Modred and touching but briefly on the Holy Grail quest. If one must look for some message or meaning in defendant's picture, it is one of social conscience and the strength of unified good government, as typified by defendant's King Arthur and his unification of Britain.

Neither plaintiff nor defendant can claim originality in using the historical background, Arthurian setting, or principal characters of the Arthurian legends: Arthur, the great king, always the central figure; Guinevere, his queen and the most beautiful woman, traditionally in love with Lancelot; Lancelot, ever the

---

a very happy one. A picture of this story would have to be handled as a magnificent and expensive pageant of splendor."

20. The importance of the Grail theme in The Sangreal was stated by plaintiff in her letter of May 1, 1934, submitting her manuscript to the M-G-M Story Editor, in which she wrote: " * * * it has all been written around Mr. Novarro, and without him as Sir Galahad the picture would lose seventy-five percent of its charm and effectiveness."

best knight, in love with Guinevere; Merlin, King Arthur's friend and elder adviser; or Modred, depicted throughout Malory and in later works as Arthur's conniving, spying arch-enemy and responsible for Arthur's unhappy end. Both plaintiff and defendant have used the idealized Arthur of Tennyson's Idylls; but where plaintiff emphasizes the illicit aspect of the Guinevere-Lancelot intrigue, defendant has idealized their characters, picturing the romance as a pure and unconsummated passion and emphasizing their adherence to vows of marriage and friendship. Plaintiff's Merlin is an evil conspirator with Modred against Arthur. Her Merlin hypnotizes Guinevere and Lancelot into a compromising tete-a-tete and is finally killed by Galahad, whom he has tried to tempt into impurity by magic, voluptuous visions, Defendant's Merlin is a wise and kindly elder, devoted to Arthur, possessed of no superhuman attributes, who warns Guinevere and Lancelot of the possible harm their love may bring and is murdered by Morgan Le Fay by means of a poisoned apple. Where plaintiff chooses one Grail Knight, Galahad, as her central figure, defendant uses Percival, Malory's other Grail Knight, as a subordinate character. Galahad appears in defendant's motion picture, for only a moment, as the six-months-old son of Lancelot and Elaine, whom Lancelot has married at Guinevere's suggestion in order to discourage the gossip about their love. Plaintiff has no character analogous to defendant's Elaine, who is a composite of Malory's Elaine, daughter of King Pelles and mother of Galahad by Lancelot (without benefit of clergy), and Tennyson's Elaine of Astolat, victim of a fatal unrequited passion for Lancelot. Conversely, defendant has no character similar to plaintiff's Blanchefleur, who, in The Sangreal, is the daughter of Earl Yniol, placed in a setting borrowed from Tennyson's Marriage of Geraint and given lyrics lifted bodily from his Gareth and Lynette. Plaintiff makes Sir Mark a visitor to Arthur's court. In one of her scenes, Guinevere and Lancelot witness the ill-fated love of Sir Tristram and Isolt and the resulting double murder and suicide, which strikes Guinevere with shame at her own similar conduct. Defendant's Mark of Cornwall is merely one of the minor kings who challenge Arthur's right to the throne. Defendant makes no use of the Tristram and Isolt legend. The few remaining Arthurian characters in plaintiff's The Sangreal do not appear in Knights Of The Round Table, which includes numerous other Arthurian figures not touched upon by plaintiff.

Plaintiff's and defendant's works differ not only in the selection of plot incidents traceable to public domain sources, but also in their arrangement and adaptation of such incidents. For example, we are told that plaintiff's Arthur has been saved by Galahad from death at the hands of Modred's knights before the beginning of Act V, and at the close of her play Arthur lives, reconciled with Guinevere. Defendant's Arthur dies of a mortal wound sustained in the final battle with Modred and his allies, in his last gasp becoming reconciled with Lancelot, by whom he sends a message of forgiveness to Guinevere. Plaintiff's Lancelot is mortally wounded in a battle with some of Modred's knights at the beginning of Act IV; defendant's Lancelot survives at the end of the picture, after having avenged Arthur's death by killing Modred in a duel and himself been rescued from quicksand by his trusty steed, Beric. In plaintiff's version, Guinevere, "realizing her full guilt" of the illicit affair with Lancelot, voluntarily goes to the nunnery at Almesbury, parting with Lancelot at the door. According to defendant's picture, Guinevere, who has never been guilty of conduct unbecoming a heroine under a strict application of movie censorship standards, is banished to the nunnery by Arthur, in commutation of a death sentence for high treason, resulting from her unjust trial and conviction, in absentia, by the Knights of The Round Table, pursuant to the foul plans of Morgan Le Fay and Modred. After Arthur's death, Lancelot visits

"Amesbury" for his final farewell to Guinevere, who has become a nun.[21] It is unnecessary to dwell upon further differences.

A review of plaintiff's claims of similarity numbered A through W, together with the additional claims of infringement made in her deposition (pp. 672–683), shows that only by a strained interpretation and hypercritical dissection of small segments of her drama or defendant's picture, or both, is she able even to allege any infringement of her original invention.[22] Further, it is ap-

21. Malory tells of Guinevere's becoming a nun at Almesbury after the death of Arthur. Malory's Morte d'Arthur, Book XXI, Ch. VII (Everyman's Library, Vol. II, p. 391).

22. Typical of the plaintiff's claims of plagiarism are the following specific charges:

"C—Lancelot is shown coming upon a band of Modred's knights in the forest and fighting with them until Arthur appears and joins the fight on Lancelot's side. I devised such a scene, but it has been transposed in the film and Arthur substituted for Galahad, who, in my script, appears and joins Lancelot in fighting Modred's knights in the forest."

\* \* \* \* \*

"H—Following in the film is a scene showing members of the court dancing—not included in my script—and then Merlin is depicted as warning Guinevere about the danger of enemies making use of her and Lancelot in overthrowing Arthur. Here, Merlin uses a metaphor (terms of fire) in speaking of this affair. I devised such a dialogue for Merlin and he could not appear in this role in Malory's, as he has 'died' (been buried under a stone) in the narrative, before either Lancelot or Modred appear at court."

[In The Sangreal (Act I, Scene VI), after hypnotizing Guinevere and Lancelot into a love tryst on a secluded terrace, for the purpose of keeping Lancelot from the Grail quest, evil Merlin says to Modred, his co-conspirator: " \* \* The Queen herself shall keep him here. Get thee behind that pillar there and watch. I'll hypnotize them both, that they shall meet here, and the *spark* whipped up into a *flame* (he laughs maliciously)—the *flame* will leap and curl—and Lancelot will delay the Quest."

[About the middle of Knights Of The Round Table (Reel 4, p. 5), wise, kindly Merlin warns Guinevere, who is alone in her chamber: "Everyone in a court has enemies \* \* \*. If the Queen's could make a lie of her that men believed, it would break the Round Table and destroy the Kingdom \* \* \*. It is Lancelot for whom I am concerned. He is the *torch* with which Modred would light up England."]

\* . \* \* \* \*

"M—Here also the film depicts Elaine telling Lancelot that she has had a dream about Galahad, seeing him armed all in white and with a white horse, as I depicted Blanchefleur, in my script, dreaming of Galahad all in white and with a white horse."

[In plaintiff's scenario of The Sangreal, Blanchefleur, who has been rescued by Galahad from "Heathen", rests in the forest and "dreams that she and Galahad are riding side by side through the forest. Everything about their furnishings is white—her dress and veil, and even the horses and their trappings—and through the branches of the trees there is a misty light, ethereal. She would be radiantly happy if it were not for the fact that although she keeps her eyes fixed on Galahad, he never looks at her, but has his eyes fixed on something ahead—an enraptured expression on his face."

[In Knights Of The Round Table, the young wife, Elaine, lying in bed, speaks to her husband, Lancelot, of her expected baby: "I saw him. He was armed all in white. His shield and spear were white; so was his horse. He had your eyes, your smile, and your bearing. And yet he was like no one, save himself. There was a great light about him \* \* \*. You know, do you not, that my dream will come true."

[The Grail Knights are traditionally pictured in white or silver armor, on white horses, white being the usual symbol of purity. An aura of light often is used to denote spirituality. Elaine's vision of her son to be is in accordance with the prophecy that Elaine should bear a son by Lancelot "the which should be named Sir Galahad the good knight \* \* \* and by him the Holy Greal should be achieved." Malory's Morte d'Arthur, Book XI, Ch. II (Everyman's Library, Vol. II, p. 126).]

\* \* \* \* \*

"U—When Arthur dies, in the film, he requests Lancelot to kill Modred and sends a message of love and forgiveness to Guinevere in the convent. My script shows *Arthur* going to Guinevere in the convent and telling her he loves

parent from a reference to the source works that plaintiff has claimed originality in many instances where none exists. Beyond any doubt, the ordinary viewer of Knights of the Round Table who had read The Sangreal would not get the impression that defendant had copied anything that is original with plaintiff from her drama. It is clear on the face of the exhibits before this court that plaintiff and defendant have woven, out of common materials, very different fabrics, with varying patterns, the defendant imitating nothing created by plaintiff.

In response to questioning by the court, plaintiff's counsel stated that the only evidence which could be introduced at a trial, in addition to that which the court now has before it, would be expert testimony as to the importance of alleged similarities between the two works and the plaintiff's own analysis of the claimed infringements, already given at length in her deposition, which the court has read. Since the defendant has admitted corporate access to plaintiff's manuscripts, no fact issue remains save the ultimate issue of actionable copying.

No amount of expert or lay testimony as to fancied similarities could change the obvious content of the exhibits before the court, namely, The Sangreal, Knights Of The Round Table, and the two principal source works, Malory's Morte d'Arthur and Tennyson's Idylls of the King. Nor could expert testimony affect the spontaneous and immediate impression of the plaintiff's and defendant's literary works upon the mind of the ordinary observer.[23] Disregarding the defendant's analysis of the plaintiff's claims of infringement and the affidavits filed by defendant as to its authors' sources, the court finds, as a matter of law, from its own examination of the exhibits, that there is no similarity—much less substantial similarity—between the protected original portions of plaintiff's work, The Sangreal, and defendant's Knights of the Round Table; and, to paraphrase the language of White-Smith Music Pub. Co. v. Apollo Co., supra, that the defendant's motion picture does not come so near to The Sangreal as to give every person seeing it the whole or any part of the original ideas created by plaintiff in The Sangreal.

The court will therefore grant the defendant's motion for summary judgment. Counsel will prepare and submit promptly an appropriate form of order.

---

and forgives her. This is a picture of Arthur given by Tennyson.

"V—Lancelot fights Modred and kills him. In my story, *Galahad* saves Arthur from a treacherous attack by Modred during Arthur's battle and kills Modred. (In Malory, Arthur kills Modred in their battle together.)"

23. Nichols v. Universal Pictures Corp., 2 Cir., 1930, 45 F.2d 119, 123; Burns v. Twentieth Century-Fox Film Corp., D.C. Mass.1948, 75 F.Supp. 986, 992.