**Eleanor HARRIS, Plaintiff,**

v.

**FAWCETT PUBLICATIONS, INC., and F. Louis Friedman, Defendants.**

United States District Court
S. D. New York.
Aug. 21, 1959.

Margulies & Heit, New York City, for plaintiff. Samuel D. Cohen, Albert Heit, New York City, of counsel.

DeWitt, Nast & Diskin, New York City, for defendant Fawcett Publications, Inc., Thomas A. Diskin, New York City, of counsel.

HERLANDS, District Judge.

## I.

In this copyright infringement action, plaintiff moves for summary judgment (F.R.Civ.P. rule 56, 28 U.S.C.A.) upon the ground "that it appears from a comparison of the defendant's story with the plaintiff's story, each of which is attached to the plaintiff's complaint, that the defendant's story was copied from the plaintiff's story as matter of law, and that there is in this action no genuine issue as to any material fact."

The plaintiff is the author of a serialized story about Elizabeth Taylor, the motion picture actress. The three instalments of the plaintiff's story were published in "Look" magazine, issues of June 26, 1956, July 10, 1956, and July 24, 1956.

The defendant Friedman is a free lance writer. He also has had long and close contacts with the motion picture industry and motion picture personalities. Defendant Fawcett Publications, Inc. (hereinafter "Fawcett") purchased Friedman's manuscript on Elizabeth Taylor and published it in the February 1958 issue of "Motion Picture" magazine.

## II.

The complaint (to which printed copies of the plaintiff's and the defendants' stories, as published, are attached) was filed on August 1, 1958. Process has not been served on defendant Friedman, a non-resident in this jurisdiction. Defendant Fawcett's answer, filed on November 28, 1958, denies the material facts of infringement and pleads the following three separate defenses: (1) that the complaint fails to state a claim upon which relief can be granted; (2) that the life, loves and lore of Elizabeth Taylor are matters of common knowledge, popular interest and widespread publicity and, hence, that defendant Friedman's use, if any, of plaintiff's story "as source material" constitutes "fair and reasonable use"; and (3) that defendant Fawcett had received from Friedman "a written representation to the effect that the said story written by said defendant [Friedman] * * * was an original composition of his and did not infringe the copyright of any other copyright proprietor"; and, consequently, if Friedman did make unfair use of plaintiff's story, Fawcett was "an innocent infringer."

## III.

In response to Fawcett's interrogatories (filed December 5, 1958) plaintiff's answers (filed January 12, 1959) detailed, with appropriate cross-references, the eighty-seven specific words, phrases and other expressions allegedly lifted consciously by Friedman from plaintiff's stories. Upon the oral argument of this motion, plaintiff submitted a parallel arrangement, entitled "Comparison Of The Two Works," showing plaintiff's contentions of copying on an item-by-item basis with respect to the eighty-seven particulars. The plaintiff's moving affidavit substantially reiterates the facts alleged in her complaint.

## IV.

The opposing papers submitted by Fawcett consist of a three-page affidavit by Thomas A. Diskin (one of Fawcett's attorneys) and a seventeen-page affidavit by Jack J. Podell (editor of Fawcett's "Motion Picture" magazine). Upon the oral argument, the court granted Fawcett time to obtain and submit an affidavit by defendant Friedman commenting on each of the eighty-seven items specified by plaintiff, with leave to plaintiff to reply. A twenty-nine-page affidavit, sworn to by Friedman on July 17, 1959, has now been duly served and filed.

The burden of the Diskin affidavit is (1) that plaintiff has no "exclusive literary property" in the "incidents" in Elizabeth Taylor's life; (2) that defendants should be given an opportunity "upon the trial" to show "common sources" available to both plaintiff and defendant Friedman; and (3) that there are "substantial differences" between plaintiff's and defendant Friedman's stories.

The Podell affidavit avers (1) that Mr. Podell was the person who suggested to Friedman that he write a life story of Elizabeth Taylor; (2) that he did not read plaintiff's published stories either before or after he discussed his idea with Friedman, and that he read plaintiff's stories only after plaintiff made the claim of copyright infringement; (3) that plaintiff's stories describe a number of incidents that were also published in articles other than by Friedman, both before and after the dates of plaintiff's published stories; (4) that the "similarities" between plaintiff's and Friedman's stories are such as would "necessarily" occur in the coverage of the life story of any "modern screen personality"; and (5) that Friedman's story is an "original" literary property.

The fatal blow to plaintiff's motion is delivered by the Friedman affidavit. That affidavit creates a genuine issue as to the material fact of copying.

To appreciate the critical impact of the Friedman affidavit, it is appropriate to restate plaintiff's position (Plaintiff's Reply Memorandum): that Friedman copied the "expression" (p. 1) and "mode of expression" (p. 2) of plaintiff's story; that Friedman's frequent use of the very same words, phrases and individualizing expressions appearing in plaintiff's story leads to the "inescapable" conclusion (p. 2) that Friedman copied plaintiff's story; that Friedman's story "was 'written' with scissors rather than with a pen" (p. 2); that Friedman used "shears to cut out a story [plaintiff's] from Look and paste to put it together in 'Motion Picture' Magazine" (pp. 5–6); that Friedman committed "literary larceny * * * of plaintiff's form of expression, *verbatim et literatim*" (p. 6); and that Friedman's present exculpatory explanations are nothing but "double-talk or shadow-boxing" (p. 6).

However, the aggregate of the following facts and circumstances set forth in Friedman's affidavit reasonably tend to pose the triable issue of "copying": (1) Friedman, a resident of Hollywood for the past sixteen years, has—since 1944—been continuously engaged in writing and publishing many articles in national magazines about Hollywood personalities, both under his own name and as a ghostwriter for many leading motion picture stars. He also worked as "magazine editor" in the Publicity Department of Twentieth Century-Fox studios from October 1951 to February 1957. (2) Ever since 1950, when he wrote a story involving Elizabeth Taylor, he became acquainted "with many of the facts about Miss Taylor and her career" and he has "continuously added" to his information about her. (3) Friedman has been married for more than twenty years to Maxine Friedman, who has also been professionally engaged for the past sixteen years as a free lance writer of magazine articles about Hollywood personalities. Mrs. Friedman "interviewed Miss Taylor in 1955," wrote several articles about Miss Taylor prior to plaintiff's articles, and discussed her interview and articles with Friedman at the time she worked on the articles. (4) During the time that Friedman was a publicist at Twentieth Century-Fox Studios, he met Miss Tay-

lor's second husband and Miss Taylor, and he "chatted with Miss Taylor and observed her." (5) During the time that Friedman was a publicist at Twentieth Century-Fox Studios, he became a good friend of Miss Jean Simmons, one of Miss Taylor's "closest friends." Miss Simmons and her husband exchanged visits with Miss Taylor. Friedman visited at Miss Simmons' home "a number of times" and "discussed with her" Miss Taylor's looks, her home life, her personal relationships, her idiosyncracies." (6) Prior to Friedman's starting the Taylor article now in issue, he had frequently discussed "Miss Taylor, her problems, her romances, her marriages, etc." with his friends "in the Publicity Department at MGM" (including four named persons "and others"). (7) In August 1957, Friedman began "researching" the life story of Miss Taylor, which Jack Podell (in July 1957) had asked him to write. Friedman's research, which took one month, consisted of the following activities:

[a] He read every magazine story he could find on Miss Taylor. This covered his own file of several hundred movie and other magazines; the files in the Motion Picture Academy Library, including a mass of newspaper and magazine clippings and "official biographies" from MGM, Miss Taylor's studio; publicity releases from MGM and Paramount Studios; trade paper and "gossip column" items; and photographs. There were two hundred and fifty-seven clippings on Miss Taylor published prior to the publication of plaintiff's three articles in June and July 1956.

[b] He talked with and interviewed ten named persons about Miss Taylor. As more fully detailed in the Friedman affidavit, eight of these ten persons were close and intimate personal friends and co-workers of Miss Taylor.

(8) Friedman says that "the facts, incidents, *quotations and expressions* of my [Friedman's] said article" were based upon "sources of information" consisting of the above mentioned "published material" and "my [Friedman's] personal knowledge, *interviews and conversations.*" (Emphasis supplied.) (9) Friedman and his wife (who collaborated with him in the research for the writing of his article) had "*independent interviews* with many, *if not all, of the persons from whom Miss Harris [the plaintiff] states that her interviews were the source for her said articles.*" (Emphasis supplied.) (10) It is common practice in the entertainment industry for the studio and press agents of personalities like Miss Taylor "to prepare quotes, incidents, and other gossip items about them, and to disseminate such items for use in publications such as the magazine articles written" by Friedman and the plaintiff. "Such dissemination is deliberately practiced and accomplished both by such personalities themselves furnishing such items directly in personal interviews with writers, and indirectly through such people as 'husband', 'secretary', 'friends', 'business acquaintances' and 'business associates'." (11) Friedman swears that his article was "substantially an original work."

## V.

■■ If, as Friedman's affidavit sets forth, he and the plaintiff "interviewed many of the *same* people, on the *same* subject," there is a reasonable probability that both the plaintiff and Friedman "would and did extract *similar incidents, language, and quotations*" for their respective articles "from these *common interview sources.*" (Emphasis supplied.) Similarly, there is a reasonable likelihood that both the plaintiff and Friedman used, at least to some extent, the same "quotes, incidents, and other gossip items" released by publicity agents of Miss Taylor or by her studio, MGM. Probative value of Friedman's exculpatory explanation depends upon his credibility, an issue whose resolution must await a plenary trial. Without attempting to evaluate Friedman's credibility, the Court believes that there is a factual issue whether Friedman used "a common source" (cf. Cloth v. Hyman, D.C.S.D. N.Y.1956, 146 F.Supp. 185, 191) and

whether the disputed material was "common property" (cf. Fred Fisher, Inc. v. Dillingham, D.C.S.D.N.Y.1924, 298 F. 145, 149–151).

## VI.

The principles applicable to motions for summary judgment in literary copyright infringement actions have been expounded in cases of which the following decisions are typical:

*Summary Judgment Granted*

Millstein v. Leland Hayward, Inc., D.C. S.D.N.Y.1950, 10 F.R.D. 198 [defendant's motion]; Costello v. Loew's Incorporated, D.C.D.C.1958, 159 F.Supp. 782 [defendant's motion]; Tralina v. Kaiser Aluminum & Chemical Corp., D.C.D.Md. 1958, 160 F.Supp. 511 [defendant's motion].

*Summary Judgment Denied*

Arnstein v. Porter, 2 Cir., 1946, 154 F.2d 464 [summary judgment on defendant's motion reversed]; Malkin v. Dubinsky, D.C.S.D.N.Y.1956, 146 F. Supp. 111 [defendants' motion]; C. S. Hammond & Co. v. International College Globe, D.C.S.D.N.Y.1956, 146 F.Supp. 514 [plaintiff's motion].

The "belief" has been expressed "that generally there should be trials in plagiarism suits" (Arnstein v. Porter, supra, 154 F.2d at page 474) with the result that "district courts have treated motions for summary judgment in plagiarism suits with caution." Millstein v. Leland Hayward, Inc., supra, 10 F.R.D. at page 199.

That this policy of caution has been enforced is illustrated by the fact that counsel have not called the court's attention to a single case where a plaintiff's motion for summary judgment was granted in an action for literary copyright infringement by plagiarism in which the issue of copying was contested by defendant.

The granting of a plaintiff's motion for summary judgment in a patent case (Vermont Structural Slate Company, Inc. v. Tatko Brothers Slate Company, Inc., 2 Cir., 1956, 233 F.2d 9; cf. Van Brode Milling Co. Inc. v. Kravex Manufacturing

Corp., D.C.E.D.N.Y.1957, 21 F.R.D. 246, 249) is not a helpful analogy. There is a fundamental difference between patent and copyright infringement. See Fred Fisher, Inc. v. Dillingham, D.C.S.D.N.Y. 1924, 298 F. 145, 150–151.

Plaintiff cites Shipman v. R. K. O. Pictures, 2 Cir., 1938, 100 F.2d 533; Lowenfels v. Nathan, D.C.S.D.N.Y.1932, 2 F. Supp. 73; Caruthers v. R. K. O., D.C. S.D.N.Y.1937, 20 F.Supp. 906; and Costello v. Loew's Incorporated, D.C.D.C. 1950, 159 F.Supp. 782. None of these decisions supports plaintiff's position. Shipman, Lowenfels and Caruthers involved defendant's motions to dismiss the complaint, which were granted; while in Costello the *defendant's* motion for summary judgment was granted.

That *arguendo* the likelihood of copying may be "very strong" is not sufficient for the granting of summary judgment, for the plaintiff had the burden of "conclusively" demonstrating defendant's copying by proving that "the similarities" are "overwhelming and pervasive." See C. S. Hammond & Co. v. International College Globe, D.C.S.D.N.Y.1956, 146 F.Supp. 514, 515. Any reasonable doubt must be resolved against the movant. See Van Brode Milling Co., Inc. v. Kravex Manufacturing Corp., D.C.E.D.N.Y. 1957, 21 F.R.D. 246, collecting cases.

In the case at bar, it cannot be said that there is not "the slightest doubt as to the facts." Doehler Metal Furniture Co. v. United States, 2 Cir., 1945, 149 F.2d 130, 135; Arnstein v. Porter, supra, 154 F.2d at page 468. Doehler and Arnstein stand for the proposition that, where there is even "the slightest trace of a factual issue," a trial must be ordered. Purofied Down Products Corp. v. Travelers Fire Insurance Company, D.C. S.D.N.Y.1959, 171 F.Supp. 399, 400.

It has been said that "the device of summary judgment should not be cloaked in pure theory, but should be viewed in purely practical settings." Vacheron & Constantin-Le Coultre Watches, Inc. v. Benrus Watch Company, Inc., 2 Cir., 1958, 260 F.2d 637, 644 (Judge Lumbard's concurring opinion). In this case

it is "extremely desirable to await the full telling of the story, rather than to bar the way summarily at the beginning." S. C. Johnson & Son v. Johnson, 2 Cir., 1949, 175 F.2d 176, 181, esp. note 2 (Chief Judge Clark's dissenting opinion).

Plaintiff's motion for summary judgment is denied. This decision and opinion constitute an order.