**E. B. MULLER & CO. et al. v. FEDERAL TRADE COMMISSION.**

No. 9046.

Circuit Court of Appeals, Sixth Circuit.
April 13, 1944.

514

Hal H. Smith, of Detroit, Mich. (F. E. Robson, Joseph A. Vance, Jr., Frank E. Cooper and Beaumont, Smith & Harris, all of Detroit, Mich., on the brief), for petitioners.

Joseph J. Smith, Jr., of Washington, D. C. (W. T. Kelley, of Washington, D.C., on the brief), for respondent.

Before HICKS, ALLEN, and HAMILTON, Circuit Judges.

ALLEN, Circuit Judge.

Petitioners, E. B. Muller & Company and Heinr. Franck Sons, Inc. (hereinafter called Muller and Franck respectively), manufacturers and sellers of granulated chicory, were charged by the Federal Trade Commission with engaging in unfair methods of competition in commerce, in violation of the Federal Trade Commission Act, Title 15 U.S.C. § 41 et seq., 15 U.S.C.A., § 41 et seq., and with unlawful discrimination in price, in violation of the Clayton Act, as amended by the Robinson-Patman Act, Title 15 U.S.C. § 12 et seq., 15 U.S.C.A. § 12 et seq. Hearings were held in 1937 and 1939, and at intervals until August 2, 1940. The Commission found the petitioners' practices were unlawful in the respects charged and entered a cease and desist order, from which this petition to review is prosecuted. Petitioners contend that the findings are not supported by substantial evidence; that the order is not authorized by the statutes, and that they were denied a full and fair hearing before the Commission.

The petitioners have been engaged in business in the United States since 1902 and 1895 respectively. During the period up to 1926 they manufactured and sold the greater part of all the domestic granulated chicory marketed in the United States. At the present time there are no manufacturers or sellers of granulated chicory in this country except the petitioners and R. E. Schanzer, Inc., of New Orleans, Louisiana (hereinafter called Schanzer), so that Schanzer is petitioners' only competitor.

The root of chicory, dried, roasted and granulated, is mixed with coffee either as a blend or a "filler." In the United States chicory is grown only in Michigan where the petitioners and Schanzer, under contract with various farmers, grow chicory for their own use in the trade and process it in their individual factories. Of late years there has been no substantial importation of foreign chicory into the United States.

Seventy-five per cent of all domestic chicory sold in the United States is consumed in the New Orleans trade area, comprising Florida, Alabama, Mississippi, Louisiana, Texas and Tennessee. Muller sells about forty per cent of its product and Franck about seventy-five per cent of its product in the southern territory. In the South chicory is used as a blend, and at times it is sold at a higher price than coffee, but outside of the South the roasters use it simply as a filler in order to lower the cost of pure coffee.

The Commission found that the petitioners do not compete with each other, but that the business of each is supplementary to that of the other, and in substance that they constitute a single enterprise, directed and controlled by David McMorran, Franck's president. This finding is supported by an abundance of evidence. David McMorran owns all of Franck's outstanding common stock, and all of the stock of the Michigan Debenture Corporation, which owns 4,400 of Franck's outstanding 5430 shares of preferred stock. David McMorran's wife, Charlotte H. McMorran, holds the legal title to five-sixths of the 30,000 outstanding shares of capital stock in Muller. The officers of Muller are Gordon McMorran, president, Charlotte H. McMorran, secretary-treasurer, and Charlotte C. McMorran, vice-president. Gordon McMorran and Charlotte C. McMorran are son and daughter of David McMorran and Charlotte H. McMorran. While prior to 1919 these two businesses were owned by different individuals and probably competed

with each other, in that year the situation changed. David McMorran, who was then an officer of Muller and together with his father owned a controlling interest therein, purchased the stock of Franck at public auction from the United States Alien Property Custodian. The sale was made after a hearing by the Federal Trade Commission, upon condition imposed that David McMorran resign as officer and director of Muller and dispose of his stock in that company. David McMorran sold his Muller stock to his father, to his attorney, and to a personal friend. In the period between 1919 and 1924 all of the Muller stock disposed of by David McMorran, together with the stock previously owned by David McMorran's father, was acquired by Charlotte H. McMorran, with funds furnished by David McMorran. It was understood that the stock was to be placed in trust for David McMorran and Charlotte H. McMorran for life, and that the trust could be terminated either by the beneficiaries jointly or the survivor of them. This trust was thereafter established with the Detroit Trust Company.

The circumstance that the trust was set aside by a decree of the Michigan state court in 1939 does not overcome the evidence of close relationship between the corporations, arising from Charlotte H. McMorran's ownership of the controlling interest in Muller, which was purchased with David McMorran's funds. The record clearly shows that Charlotte H. McMorran takes little active part in the business, and that David McMorran dominates both companies. Muller furnishes David McMorran with an office and stenographic help at its principal place of business in Port Huron, Michigan, for which it receives no compensation. David McMorran is usually present at Muller's stockholders and directors' meetings and actively participates in the discussion and shaping of Muller's general business policies. He has permissive access to Muller's files at Port Huron.

The companies are so operated that they assist and benefit each other in their business. In 1920 Muller made an arrangement to supply the Michigan Debenture Company, whose stock was wholly owned by David McMorran, with $440,000, so that the Debenture Company could purchase from Franck $440,000 of its preferred stock. The arrangement was carried through contemporaneously and Muller was thus shown to be one of the principal factors in furnishing Franck with $440,000 of working capital. A practical division of business has been set up between Muller and Franck under which the latter concentrates upon packaged goods, retaining only a small number of old customers of bulk goods, while Muller manufactures very few packaged goods and confines itself mainly to the sale of chicory in bulk. A similar practical division of territory is made between Muller and Franck. Franck operates principally in New Orleans, New York, San Francisco and Los Angeles, selling through brokers. Muller uses traveling salesmen and covers the entire country. The South in general is covered by Muller, with the exception of New Orleans, Atlanta and Memphis, where Franck retains some old customers. Schanzer's sales are in general confined to the southern states.

A noncompetitive relationship has existed between Muller and Franck for over twenty years. Since 1921 Van Slambrouck, Muller's vice-president and production manager, has been in the habit of consulting with David McMorran as to Muller's business. These consultations were more frequent up to 1929, when Gordon McMorran became president of Muller, and specifically included the subject of prices to be instituted by Muller. Petitioners contend that the close relationship ceased in 1929, but the record does not sustain this contention. In 1930 David McMorran instructed Beitter, Franck's manager, to consult with Muller's sales manager "before making the change" in prices. In 1932 Van Slambrouck wrote to Eisinger, Muller's sales manager in New York, suggesting that Eisinger go to New Orleans and talk with one of Muller's important customers, and said, "before doing so it might be well for you to write D. [David McMorran] and frankly ask him what you are authorized to do in the matter of further price concessions in New Orleans proper and out of town to combat the Schanzer competition." Letters written in 1934 by both the sales manager and the president of Muller contain statements to the effect that Muller does not desire any of Franck's business. When Maxwell House, which had been a customer of Franck from 1930 to 1934, began to do business with Schanzer in 1934, Muller competed for the account, and Franck dropped any attempt to retain it.

Petitioners concede that the ownership is such as might give David McMorran and his family control of both corporations. They do not contend that the evidence summarized and much other evidence referred to in the findings was not presented before the Commission, but state that certain contradictory evidence presented by petitioners requires a contrary conclusion. · However, the findings of the Commission on issues of fact are controlling here, "So long as there is warrant in the record for the judgment of the expert body. * * *" Rochester Tel. Corp. v. United States, 307 U.S. 125, 145, 59 S.Ct. 754, 764, 83 L.Ed. 1147. The evidence presented fully warranted the finding of unitary domination and control. Consequently petitioners' contention that the order of the Commission is unauthorized in that it orders "both petitioners" to cease disparagement of Schanzer's product, and to cease misrepresentations as to the color of their granulated chicory, being based upon the premise that no unitary control exists, has no merit and will not be further considered.

The finding that Muller obtained substantially lower freight rates than those properly applicable, falsely and fraudulently representing to the railroads that certain of its cars, which contained large quantities of chicory and similar quantities of coffee substitutes, contained chicory only, is not contested. The petitioners endeavor to soften the significance of these findings in briefs and argument; but it appears that Muller pleaded guilty to an indictment for unlawfully, wilfully and knowingly misbilling chicory and coffee substitutes. The finding that the falsified billings were made with Muller's knowledge and with the deliberate intent of obtaining an illegal freight rate is thus amply supported, and is reenforced by letters written by the principal officials of Muller, warning their agents and employees that this misbilling must be concealed. Petitioners do not contest the finding that Muller used iron oxide for artificial coloring purposes, falsely representing that the desirable and uniform color thus secured was achieved by superior methods of roasting and a painstaking process of selecting and sorting. The finding that Muller disparaged Schanzer's chicory by falsely representing that it contained molasses, sugar beet, and other foreign substances, and that Franck falsely represented that Schanzer's chicory contained sugar beet, also is not challenged. These conceded facts establish that unfair competition was practiced by the petitioners in these respects as charged. False disparagement of the competitor's goods is an unfair method of competition. Perma-Maid Co. v. Federal Trade Commission, 6 Cir., 121 F.2d 282. False advertising of a product, process or method by malicious active misrepresentations with reference to a method of achieving color and uniformity of color in chicory, violates the Federal Trade Commission Act. Ford Motor Co. v. Federal Trade Commission, 6 Cir., 120 F.2d 175, 181, certiorari denied 314 U.S. 668, 62 S.Ct. 130, 86 L.Ed. 535.

Petitioners attack the finding that they sold below cost during 1936 and 1937, with intent to injure competition, principally in the New Orleans territory, where they competed with Schanzer.

The Commission found that during the six months ending June 30, 1936, Franck sold the greater part of its granulated chicory to two customers in New Orleans at a loss of approximately eleven cents per hundred pounds, and at cost, or slightly below cost, during the eight months ending March 31, 1937. Profitable sales, however, were made to other customers in amounts and for prices sufficient so that the business as a whole was not operated at a loss. Muller's entire business in 1936 and 1937 was conducted at an average loss of eighteen cents and eight cents per hundred pounds respectively, prices in New Orleans being in general substantially lower than in other areas where Muller did not have to compete with Schanzer. Muller's counsel concede that in 1936 and 1937 it sustained a loss on the total volume of granulated chicory sold, but contend that the Commission's findings as to degree of loss rest upon an arbitrary and unjustified distribution of cost made by the Commission's accountant. The rule that the Commission's findings of fact are conclusive unless the record shows that they are clearly erroneous applies to findings based upon expert testimony, First National Bank v. Commissioner, 6 Cir., 125 F.2d 157, and the Commission is not bound to accept the opinion of petitioners' accountants. Helvering v. National Grocery Co., 304 U.S. 282, 295, 58 S.Ct. 932, 82 L.Ed. 1346; Gamble v. Commissioner, 6 Cir., 101 F.2d 565, 567, certiorari denied 306 U.S. 664, 59 S.Ct. 790, 83 L.Ed. 1061; Mott v. Commissioner, 6 Cir., 139 F.2d 317. The Commission's ac-

countant is thoroughly qualified. He made revisions of his estimates at the trial in accordance with the testimony brought out by petitioners. The basis of the Commission's tables of costs was a transactions method of allocating certain expenses which was employed in these accounts by Franck's own auditor. We cannot say that the methods employed were "so entirely at odds with fundamental principles of correct accounting" (Kansas City Southern R. Co. v. United States, 231 U.S. 423, 444, 34 S.Ct. 125, 131, 58 L.Ed. 296, 52 L.R.A.,N.S., 1) that they should be disregarded. American Telephone & Telegraph Co. v. United States, 299 U.S. 232, 236, 57 S.Ct. 170, 81 L.Ed. 142.

Moreover, the contention that the Commission's figures unfairly reflect the situation has little weight in view of the fact that the finding on this point is supported by voluminous evidence derived from petitioners' own management and employees. Repeated statements are made in the official corespondence of the petitioners, quoted in the Commission's findings, to the effect that the petitioners at the time were selling substantially below cost. Muller's sales manager, on November 8, 1935, declared that the prevailing price of five and one-half cents "is already substantially below cost." David McMorran proposed on January 3, 1934, to cut prices in order to eliminate Schanzer, stating that "A cut of one-fourth to one-half cents will mean some loss to us." These statements, made in previous years, have weight not only upon the question of intent to eliminate Schanzer, but also upon the question whether sales consummated in 1936 and 1937, when the price-raising scheme had been put into effect, were actually below cost. In 1936 Gordon McMorran wrote to Muller's New York office, "The prices you set are below our cost at Port Huron," and in 1937 Muller's general sales manager advised the New Orleans office that the then current price resulted in loss. Petitioners attempt to explain these statements by saying that Schanzer had initiated a price war against them; but the Commission found, and the record clearly shows, that the price-cutting was begun by petitioners with the deliberate intent to destroy their only competitor.

■■■■ The conceded disparagement of Schanzer's product and the conceded false representations as to the quality of petitioners' own product, already discussed, have weight upon the question of the existence of unlawful intent. Much evidence both oral and written, supports the Commission's findings and shows a deliberate intention on the part of Muller and Franck to stifle Schanzer's competition by cutting costs. A letter dated September 9, 1935, written by Muller's New York office, in speaking of statements made by Schanzer that he would do nothing that year on the new plant for manufacturing chicory in Michigan, concludes with these sentences: "Evidently Neal [Schanzer's financial backer] has drawn in the lines on account of poor conditions. So by continuing our efforts and putting a crimp into him wherever possible, we may ultimately curb this competition if we should not succeed in eliminating it entirely." In view of this evidence, petitioners' contention that the sales were made in good faith in order to meet competition and hence were not unlawful within the doctrine of Federal Trade Commission v. Gratz, 253 U.S. 421, 427, 40 S.Ct. 572, 64 L.Ed. 993, and Federal Trade Commission v. Sinclair Refining Co., 261 U.S. 463, 475, 43 S.Ct. 450, 67 L.Ed. 746, cannot be sustained. A letter from a sales representative to Muller, January 14, 1933, declares: "I am sorry that we have allowed Schanzer to get to the point where he can expand, which was made possible by partner who has some capital. However, if a reduction on tariff should take place, it would make the situation still worse. I certainly hope that we can, as you expect, eliminate him entirely, by making prices that he cannot meet without losing money." Gordon McMorran admitted that he advised his salesmen that Muller must "at any cost" regain the volume of business lost to Schanzer. These statements must be read in light of the controlling fact that Schanzer is petitioners' only competitor, and so read they evince an evident determination to destroy Schanzer's business.

■■■■ The fact that the sales were not greatly below cost does not aid the petitioners. It was not necessary that the evidence show that Schanzer suffered loss. Federal Trade Commission v. Raladam Co., 316 U.S. 149, 152, 62 S.Ct. 966, 86 L.Ed. 1336. The purpose of the Federal Trade Commission Act is to prevent potential injury by stopping unfair methods of competition in their incipiency. Fashion Originators' Guild v. Federal Trade Commission, 312 U.S. 457, 466, 668, 61 S.Ct. 703,

85 L.Ed. 949. But loss was shown. Prior to the latter part of January, 1937, Schanzer had cut its prices to meet the petitioners' competition; but at that time it was compelled to increase prices, and its sales dropped from 2,319,507 pounds in 1936 to 1,459,195 in 1937. During the same year petitioners' sales increased 872,351 pounds. Schanzer lost substantial amounts of the business of three of its largest customers, the American Coffee Company, the Trico Coffee Company of New Orleans, and the Mobala Coffee Company of Mobile, Alabama. The importance of these losses is emphasized by the fact that Schanzer is a relatively small concern, having a net worth of about $70,000 as compared with $743,000 for Muller and $1,256,000 for Franck. Meanwhile the petitioners discriminated in price between customers of different areas, selling chicory so much lower in the territory to which Schanzer had access than in the rest of the country, that they were able to recoup their losses in the New Orleans territory.

■ The Commission found, and the petitioners do not deny, that they have each discriminated in prices between purchasers of granulated chicory of like grade and quality since the effective date of the Robinson-Patman Act, Title 15 U.S.C. §§ 13, 21, 15 U.S.C.A. §§ 13, 21. Muller discriminated at times by selling the higher class or premium chicory at or below the price of standard or ordinary chicory, and also gave rebates to certain customers. It did not allow for differences in transportation costs and discriminated in favor of the New Orleans customer in varying degrees as against St. Louis, Memphis, Atlanta, and Birmingham customers. These discriminations were not, as petitioners would have us believe, unrelated to the central purpose, which was the destruction of petitioners' only competitor. By discriminating against other general trade areas in favor of New Orleans, Muller, on the one hand, was able to force the price so low in New Orleans that Schanzer could not meet its competition. On the other hand, by selling at higher prices in other general trade areas, Muller made up its loss in the New Orleans district.

Petitioners contend that in spite of the conceded discrimination, their course of conduct is not forbidden by the statute, Title 15 U.S.C. §§ 13 and 21, 15 U.S.C.A. §§ 13, 21. They urge that since Muller's standard grade of chicory was not of "the

same grade and quality" as Schanzer's, there could be no discrimination against Schanzer. But the Commission did not find that there was discrimination against Schanzer. It found that the discrimination between the petitioners' customers injured Schanzer and tended to establish a monopoly. The record clearly shows that this discrimination existed between competing customers, although the statute requires only that the discrimination be between "different purchasers of commodities of like grade and quality." Since the discrimination prohibited is one the effect of which "may be substantially to lessen competition or tend to create a monopoly" or to "prevent competition with any person who either grants or knowingly receives the benefit of such discrimination," the statute clearly applies. The discrimination found to exist tended to create a monopoly.

■ The most serious contentions raised by petitioners are that they were not accorded a full and fair hearing and were denied due process (1) because they were not furnished the particulars of the charge as to discrimination, and (2) because they were not granted a subpoena duces tecum as prayed. The right to a full and fair hearing is one of the substantial rights of a litigant, constituting one of "the rudiments of fair play. Chicago, M. & St. P. R. Co. v. Polt, 232 U.S. 165, 168, 34 S.Ct. 301, 58 L.Ed. 554." Ohio Bell Tel. Co. v. Public Utilities Commission of Ohio, 301 U.S. 292, 304, 57 S.Ct. 724, 730, 81 L. Ed. 1093. It includes not only the right to present evidence, but also "a reasonable opportunity to know the claims of the opposing party and to meet them." Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 773, 776, 999, 82 L.Ed. 1129. Cf. Powhatan Mining Co. v. Ickes, 6 Cir., 118 F.2d 105.

With reference to the first point, petitioners contend that their motion to require the attorney for the Commission to furnish a statement as to the particular sales relied on as constituting discrimination should have been granted and that in default of such relief petitioners were deprived of the opportunity to rebut the charge by evidence as to the particular transactions relied upon. They urge that they were entitled to meet proof as to discriminations by showing [§ 2(a) of the Clayton Act] that the differential in price was not between different purchasers of commodities of like grade or quality; that the differentials were due to differences in cost of

manufacture, sale or delivery resulting from different methods or quantities or due to changing conditions of the market, etc. They claim that within the terms of § 2(b) of the Clayton Act whatever discrimination existed was in fact ma/le "in good faith to meet an equally low price of a competitor."

This contention is based on the fact that the Commission, by subpoena duces tecum, required the petitioners to produce all invoices of sale for the period between September, 1935, and October, 1937. These were offered in evidence as being relevant on the question of discrimination as well as on other features of the case. Counsel for petitioners urged, and still contend, that the petitioners could not meet the claim of the Government and explain and justify the various transactions without knowing upon which particular transactions the Government would rely. They assert that not until the brief of the Commission was received in 1940 was any information given as to the sales relied on as evidence of discrimination. The findings of the Commission specify certain transactions held to be discriminatory, but this was after the hearing was closed.

We think the contention that the petitioners were not given particulars of the charges against them has no merit on this record. While the Commission offered evidence of some 1,100 transactions claimed to establish a consistent practice of discrimination, petitioners were advised in the complaint that one of the principal charges was that the petitioners in the course and conduct of their respective businesses were selling below cost in interstate commerce and engaging in a practice of price discrimination. During the hearings they were repeatedly advised by counsel for the Commission that the charge was one covering a course of conduct. The Federal Trade Commission Act gives the Commission jurisdiction to prevent unfair methods of competition in commerce. It does not deal with specific acts claimed to be unfair, but with unlawful methods and practices in commerce. Keller v. Federal Trade Commission, 7 Cir., 132 F.2d 59, 61; Hill v. Federal Trade Commission, 5 Cir., 124 F.2d 104, 106; Hershey Chocolate Corp. v. Federal Trade Commission, 3 Cir., 121 F.2d 968, 971, 972. The Commission could not prove a course of conduct for the period charged by picking out a few instances of isolated sales. The violations charged in this record could be established only by evidence of many transactions considered as a group, and involving a comparison of prices and costs over a substantial period of time. The invoices on their face presented a prima facie case of discrimination, for they showed that as to numerous and varying prices charged in different cities and in different trade areas during the period in question, there was no justification in differences of freight cost, quality, quantity, etc. We think that since the statute imposes upon the petitioners the burden of rebutting a prima facie case of discrimination, Title 15 U.S.C. § 13(b), 15 U.S.C.A. § 13(b), the Commission's counsel should in fairness have specified the individual or group transactions which he claimed constituted unlawful discriminations. He should have stated that he relied on the transactions between Franck, Reily & Company, Merchants Coffee Company, American Coffee Company, Southern Coffee Mills Company of New Orleans, and Golden Gate Supply Company of San Francisco, and other instances of discrimination specified in the findings of the Commission with reference to the selling of granulated chicory of like grade and quality to some customers at materially higher prices than to others, not justified by cost differences. We think no prejudice was shown by this failure for the petitioners were well acquainted with the transactions covered by the invoices and could not have been surprised at any claim of discrimination based thereon. Moreover, petitioners had the right under § 5(c) of the Federal Trade Commission Act (Title 15 U.S.C. § 45, 15 U.S.C.A. § 45(c), if they were prejudiced, to apply to this court for leave to adduce additional evidence to explain and justify the transactions found by the Commission to constitute unlawful discrimination. No such application was made. The Supreme Court has held that even in case of an arbitrary refusal to receive testimony, when petitioners fail to avail themselves of this right (Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 226, 59 S.Ct. 206, 83 L.Ed. 126), due process is not denied. We conclude that the petitioners were not refused a fair trial in this regard.

With reference to the refusal of a subpoena duces tecum, it appears that the petitioners early in the hearings stated that they meant to apply for an order to compel Schanzer to produce his books as evidence in the case. Schanzer stated that he

was willing to have a disinterested auditor procure any information to which petitioners were entitled, but refused to produce the books, upon the ground that they contained the names of his customers, the sources of his capital, and other confidential information. The Commission ordered Schanzer either to produce his books and records or to produce data and information taken from the books and records, giving the information to which the petitioners were entitled. Schanzer furnished certain exhibits in accordance with this order, which were revised to conform to petitioners' objections, but refused to itemize these exhibits so as to give information as to his customers. The Commission in effect sustained Schanzer in this position.

 Petitioners' contention upon this point is untenable. The Commission, in the issuance of a subpoena duces tecum, is invested with a quasi-judicial discretion, and is authorized to deny the application in its entirety if it is "too sweeping in its terms to be regarded as reasonable." Hale v. Henkel, 201 U.S. 43, 76, 77, 26 S.Ct. 370, 380, 50 L.Ed. 652; Federal Trade Commission v. American Tobacco Co., 264 U.S. 298, 306, 44 S.Ct. 336, 68 L.Ed. 696, 32 A.L.R. 786. Under such circumstances a demand for the whole is not warranted, even though some part of the papers asked for may be relevant. Goodyear Tire & Rubber Co. v. National Labor Relations Board, 6 Cir., 122 F.2d 450, 453, 136 A.L.R. 883. An application which would compel Schanzer to give a complete list of his customers and the sources of his operating capital was unreasonable. The customers' list is a valuable property right, entitled to protection, and in general privileged against disclosure. Crocker-Wheeler Co. v. Bullock, C.C., 134 F. 241, 248. The Commission did not abuse its discretion in denying the application, and the petitioners received all the information to which they were entitled. The proceedings, considered as a whole, were extremely fair.

 Petitioners finally contend that this proceeding is not, as required by the statute, Title 15 U.S.C. § 45(b), 15 U.S.C. A. § 45(b), instituted in "the public interest." Federal Trade Commission v. Raladam Co., 283 U.S. 643, 647, 51 S.Ct. 587, 75 L.Ed. 1324, 79 A.L.R. 1191. Upon this point also the Commission must be sustained. The basic fact of the case is that

Schanzer is the only competitor of Muller and Franck in the production and distribution of domestic chicory. Since competition has substantially ceased between the petitioners, they would divide the field in a complete monopoly if Schanzer were to be eliminated. The record clearly shows that the petitioners have resorted to unfair and illegal practices within the meaning of the Act. Hence the proceeding aimed to suppress the practices is "in the interest of the public." Federal Trade Commission v. R. F. Keppel & Bro., 291 U.S. 304, 54 S. Ct. 423, 425, 78 L.Ed. 814. Cf. National Broadcasting Co. v. United States, 319 U. S. 190, 224, 63 S.Ct. 997, 87 L.Ed. 1344, construing a similar provision of the Communications Act, Title 47 U.S.C. § 303(g) and (r), 47 U.S.C.A. § 303(g, r). To suppress elimination of competition and to prevent monopoly is in the public interest. Hershey Chocolate Corp. v. Federal Trade Commission, supra; White Bear Theatre Corp. v. State Theatre Corp., 8 Cir., 129 F.2d 600, 605. To protect the purchasing public against deceptive methods and misrepresentations by which purchasers are deceived is in the public interest. Federal Trade Commission v. Royal Milling Co., 288 U.S. 212, 217, 53 S.Ct. 335, 77 L.Ed. 706; Ford Motor Co. v. Federal Trade Commission, supra. That Schanzer individually may benefit from the Commission's order is immaterial.

 Numerous attacks are made upon the form and validity of the order, but the foregoing considerations dispose of most of them. The order is authorized by the statute and is proper in scope. We consider here only the contention that it is void for indefiniteness due to the fact that it prohibits discriminations in price between different "trade areas." Petitioners urge that because the term "trade areas" is not defined, they cannot comply with the order. In light of the record we think that the meaning of the term is plain. Such orders are necessarily general [Chamber of Commerce of Minneapolis v. Federal Trade Commission, 8 Cir., 13 F.2d 673, 696], and must be "broad enough to prevent evasion." Local 167 v. United States, 291 U.S. 293, 299, 54 S.Ct. 396, 399, 78 L.Ed. 804.

The Commission's order to cease and desist is affirmed, and the petitioners are commanded to comply therewith. The petition to review is dismissed.