**H. J. HEINZ COMPANY, a corporation, Plaintiff,**

v.

**BEECH–NUT LIFE SAVERS, INC., a corporation, Defendant.**

United States District Court
S. D. New York.
Feb. 3, 1960.

Stewart L. Whitman, Bert A. Collison, New York City (Paul M. Duff, Pittsburgh, Howrey & Simon, Washington, D. C., and Nims, Martin, Halliday, Whitman & Williamson, New York City, of counsel), for plaintiff.

Rogers, Hoge & Hills, Dewey, Ballantine, Bushby, Palmer & Wood, New York City (George S. Hills, Andrew J. Graham, Philip C. Scott, Leonard Joseph, Aram J. Kevorkian, New York City, of counsel), for defendant.

LEVET, District Judge.

This case involves what the plaintiff labels a "price war" in the baby food products market in the State of California.

On September 4, 1957, the defendant, Beech-Nut Life Savers, Inc. (hereinafter referred to as "Beech-Nut") reduced its prices on baby food in California to a level lower than its prices east of the Mississippi River. Price reductions followed by the other two large baby food competitors in California, Gerber Products Company (hereinafter referred to as "Gerber") and the plaintiff, H. J. Heinz Company (hereinafter referred to as "Heinz").

On December 23, 1957, Gerber filed suit in this court alleging that Beech-Nut's price reductions in California constituted an illegal territorial price discrimination. Beech-Nut counterclaimed, alleging various antitrust violations on the part of Gerber. On January 8, 1958, Gerber moved for a preliminary injunction, asking in effect that the defendant be required to restore its prices to the level of prices charged east of the Mississippi. The motion for preliminary injunction was denied by Judge Edward Weinfeld on April 23, 1958 (Gerber Products Co. v. Beech-Nut Life Savers, Inc., D.C., 160 F.Supp. 916) and the suit was subsequently dismissed by consent of the parties. The present suit was instituted by Heinz in January 1958 and was consolidated with the Gerber suit before the latter was dismissed.

A pre-trial order was signed and filed on November 19, 1959. By the terms of

William Simon, John Bodner, Jr., Richard L. Perry, Washington, D. C.,

this order a consolidated trial of Count I of plaintiff's complaint and of the defendant's counterclaims was to begin on February 1, 1960. However, on December 14, 1959 the defendant filed a motion for summary judgment dismissing the claim alleged in Count I of the complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A. This is the decision on that motion.

On or about December 22, 1959, the plaintiff filed a motion for summary denial of defendant's motion for summary judgment pursuant to Rules 11, 12(f) and 56 of the Federal Rules of Civil Procedure. Argument on this motion was heard on December 30, 1959. Decision was reserved pending a hearing on the merits of the motion for summary judgment. This hearing on the merits of the motion was held on January 15, 1960.

For the purposes of this motion the relevant pleadings may be summarized as follows:

Count I of the complaint alleges that defendant Beech-Nut violated Section 2 of the Clayton Act, 15 U.S.C.A. § 13, by discriminating in price, discounts and allowances between its various customers in the sale of baby food. This allegation is based upon the claim that defendant charged lower prices and gave more favorable discounts and allowances to its customers in California than it offered to its customers east of the Mississippi River.

Plaintiff Heinz also sells baby food in the California market and alleges that by reason of defendant's reductions in prices in that market it was forced to reduce its own prices, thereby sustaining a loss in revenue.

Defendant admits that its prices in California were lower than its prices east of the Mississippi River. It also admits that plaintiff reduced its prices on baby food in California to the same level as that to which defendant had reduced its prices. The allegations of consequential liability are denied.

The facts as alleged by the defendant in its motion for summary judgment with the accompanying affidavit and by counsel for both parties in the argument on the motion held on January 15, 1960 appear to differ in no substantial degree. The conclusions drawn from these facts form the area of contest. These facts are as follows:

## I.   Relative Economic Strength Of The Competitors

1.   Plaintiff Heinz is a substantial company of long standing in the food business. It manufactures and sells a large number and variety of food products. During the 1959 fiscal year its net sales exceeded $300 million, producing a net income after taxes in excess of $11 million. Its total assets exceed $235 million and its earned surplus is just under $69 million. (Affidavit of Edward J. Jordan, President of Beech-Nut Life Savers, Inc., sworn to on December 11, 1959, ¶3)

2.   Heinz entered the baby food market in 1932 and has been an important national supplier in the baby food business for many years. Baby foods are preparations of meat, vegetables, fruits and other foods specifically designed for infants.

3.   In 1957, Heinz had approximately 15% of the national baby food market. During the same year it had approximately the same percentage of the California market. (Jordan affidavit, ¶¶ 5, 7; SM 3, 4 of hearing on motion for summary judgment held on January 15, 1960. [The stenographic minutes of that hearing will be referred to hereinafter as "SM"])

4.   Defendant Beech-Nut is also engaged in the manufacture and sale of baby foods. In addition, it manufactures and sells chewing gum, "Life Savers" candies, coffee and cough drops. All of its products, except baby foods and coffee, are distributed nationally. Its baby foods are distributed generally east of the Mississippi River, but distribution west of the Mississippi River is limited to California. Beech-Nut entered the California baby food market in 1949. (Jordan affidavit, ¶¶ 4, 6)

5. For the year 1958, Beech-Nut's total net sales were just under $115 million, yielding a net income after taxes of approximately $8 million. Its total assets were approximately $77 million and its earned surplus in excess of $28 million. (Jordan affidavit, ¶3)

6. Beech-Nut had been engaged in the manufacture and sale of baby foods since 1932. As of 1957, Beech-Nut had approximately 20% of the total national market. (Jordan affidavit, ¶5)

7. Plaintiff maintains that the national sales percentages of the parties are misleading because of the fact that Heinz sells in the whole United States and has 15% of the national market, while Beech-Nut sells only in roughly 25 of the 50 states and has 20% of the market. Counsel for the plaintiff maintain that if the market share of the area east of the Mississippi River, plus California, which is the only area where the parties compete, were considered, Beech-Nut would have 30% of the business. (SM 23)

8. In the New York market, which is the largest baby food market in the world, Beech-Nut has 50% of the market. (SM 24)

9. The leading company in the national baby food market is Gerber. In 1957, Gerber had approximately 47% of the total national market. Its net sales in the fiscal year 1959 were approximately $127 million, yielding a net income of approximately $7 million. Its total assets were approximately $61 million and its earned surplus approximately $20 million. (Jordan affidavit, ¶¶ 3, 5)

10. Baby food sales of Gerber are in the order of $100 million a year, while baby food sales of Beech-Nut are in the order of $45 million a year, and those of Heinz are in the order of $30 million a year. (SM 24, statement by counsel for the plaintiff; the year was not given)

11. The total United States sales in all products of the three companies are as follows:

Gerber      – $100 million
Beech-Nut – $120 million
Heinz       – $148 million

(SM 24, statement by counsel for the plaintiff; the year was not given)

12. The total profits in the United States of the three companies are as follows:

| | 1956 | 1957 | 1958 |
|---|---|---|---|
| Gerber | $6 million | $7.7 million | |
| Beech-Nut | $7.9 million | $8.5 million | |
| Heinz | $3.8 million | $3.0 million | $1.6 million |

(SM 25)

13. The profits and losses of the parties from the sale of baby foods are as follows:

| | 1954 | 1955 | 1956 | 1957 | 1958 |
|---|---|---|---|---|---|
| Beech-Nut | $3 million | $3 million | | | |
| Heinz | | Loss of $81,000 | $1.3 million | $1.4 million | Loss of $303,000 |

(SM 25, 26)

The profits and losses of Beech-Nut for the years 1956, 1957 and 1958 were not given. Figures bearing on Beech-Nut's losses in *California* during portions of those years are as follows:

1956—Loss of $120,000

Last 3 months of
1957—Loss of $300,000

First 6 months of
1958—Loss of $585,000

(SM 127)

14. Before the "California price war" Beech-Nut's profits were about 7% of its total sales and Heinz' profits were about 2% of its sales. The reason for this disparity, according to the plaintiff, is that there is a low margin of profit in the sale of food while there is a high margin of profit in the sale of gum and "Life Savers." (SM 27)

15. The plaintiff contends that before the price war Beech-Nut had "capital" of $25 million while Heinz had a long-term funded indebtedness resulting from an expansion program. (SM 38, 39. Counsel for the plaintiff did not further define the term "capital" but commented: "Beech-Nut had $25,000,000 of cash or the equivalent with which they could wage a price war if they wanted to." SM 40)

## II. The Status Of The California Baby Food Market

16. In 1957, the California market for baby foods was for all practical purposes divided between Heinz, Beech-Nut and Gerber. In the first three quarters of 1957, Gerber accounted for approximately 77%, Heinz, 16% and Beech-Nut 7% of the sales. (Jordan affidavit, ¶ 7)

17. Campbell Soup Company, which sells $400 million to $500 million a year in food products, with profits in the order of $25 million to $30 million a year, had gone into the baby food business in California and its baby food business was a failure there and it withdrew from the market. (SM 29)

18. Clapp's baby food had also been sold in California. Clapp baby food was manufactured and marketed by American Home Products Company which in 1950 had national sales of $200 million a year and profits in excess of $10 million a year. In 1951, Clapp withdrew from the California market because it was not profitable. In 1953, American Home Products Company withdrew entirely from the baby food business. (SM 31)

19. Libby also sells baby food in California. Libby is the second largest marketer of adult canned fruits in California and has sales in the order of $300 million a year. Libby has less than 2% of the California baby food business, and the only chain store which Libby had in California prior to the price war was the Purity chain which was the second biggest chain in Northern California. (SM 29)

20. Swift & Company sells baby food in California. Although Swift & Company has assets of $2.5 billion, it has a minute share of the baby food market. (SM 33)

21. Although Gerber and Heinz had been in the California baby food market for many years, Beech-Nut did not enter the market until 1949. By 1955, Beech-Nut had achieved a market penetration of approximately 9% as against Gerber's 76% and Heinz' 15%. The total combined sales (in dozens) of both "junior" and "strained" baby foods by Beech-Nut and the market percentage for the first nine months of the years 1955, 1956 and 1957 are as follows:

1955—989,184—9%
1956—933,818—8.3%
1957—818,398—6.8%

The same sales and percentage figures for Heinz during that period are:

1955—1,702,166—15.4%
1956—1,824,590—16.1%
1957—1,919,278—16%
(Jordan affidavit, ¶¶ 6, 7)

## III. Types Of Containers Used And Relative Prices

22. Beach-Nut always packed its baby foods in glass jars. While at one time Heinz and Gerber packed only in tin

cans, in the mid 40's Gerber and Heinz converted to glass east of the Mississippi River, while continuing to sell in tin in the western part of the country. In late 1954, Heinz converted to glass in the area west of the Mississippi and now sells only in glass throughout the entire country. Gerber continues to sell in glass east of the Mississippi and in tin elsewhere. (Jordan affidavit, ¶4)

23. When Beech-Nut entered the California market in 1949 with glass containers it established the glass price that it had in the rest of the country, which was roughly $.15 a dozen higher than the price of tin.

In 1949, Heinz sold in California in tin and the Heinz tin container was the same as the Gerber tin container and sold at the same price.

When Heinz converted from tin to glass in California in 1954 it adopted the glass price at which Beech-Nut was selling in glass in that market. The difference was $.15 a dozen. (SM 45, 46)

24. Glass is a more desirable container, although packing in glass is a substantially more costly operation. Gerber packs in both glass and tin and counsel for the plaintiff contends that the deposition evidence shows that the difference in the cost of the container alone results in a cost difference of $.11 a dozen. Other cost differences result from breakage of the glass container. Plaintiff argues that the $.15 differential is less than the actual cost difference between the two types of containers. (SM 47, 48)

25. Beech-Nut's advertising and promotion is built around the superiority of the glass container. (SM 48)

IV. Background Of Beech-Nut's Price Cut

26. The reasons advanced by the plaintiff for the decline in sales of Beech-Nut shown in No. 21 above are as follows:

(a) Poor management in the California sales office.

(b) The firing of the nutritionists who previously had worked promoting the sales of baby food to mothers.

(c) Discontinuance of radio and television advertisements and concentration on one unsuccessful television show.

(d) Poor service to the stores in setting up displays and keeping the departments clean. (SM 54, 55)

Counsel for the defendant did not set forth the reasons for the relative decline in sales of Beech-Nut during the argument on the motion but implied in the brief in support of the motion that the price differential between Beech-Nut and Gerber was an important factor. (Brief, p. 7)

27. The plaintiff further maintains that the reasons for the increase in sales by Heinz are as follows:

(a) Conversion from tin to glass.

(b) Distribution through wholesalers instead of direct to retailers.

(c) Specialized baby food salesmen.

(d) Continued nutritionist program.

(e) Installation of the roll-rack, a plastic device for vending baby foods.

(f) Consistent advertising and overall marketing program. (SM 56, 57)

28. In the Northern California area (which counsel for the plaintiff states "is critical in this lawsuit") where Beech-Nut's sales continued to be greater than Heinz', even during the decline of Beech-Nut's market percentage elsewhere, a two-brand market existed. The majority of the grocery stores carried only two brands of baby foods and usually had one brand in tin and one in glass to satisfy the demand of customers. Almost all the stores had Gerber's baby food in tin and most had either Heinz or Beech-Nut in glass. Almost none of them had both Heinz and Beech-Nut. (SM 57, 58, 59)

29. In the San Francisco area or in the Northern half of California, there were eleven large chain stores. Beech-Nut was sold in eight of them and Heinz in three. (SM 57)

The two biggest chain stores in Northern California are Safeway and Purity. Beech-Nut was not sold in either of these stores as Safeway carried Gerber and Heinz and Purity carried Gerber and Libby. (SM 57, 58)

30. A survey by Beech-Nut in Northern California in September 1957 showed that 68.8% of the stores carried Beech-Nut and 30.3% carried Heinz. (SM 59)

31. A document prepared by Beech-Nut headed, "Beech-Nut Progress as of February 11, 1957," lists the 45 largest chain stores in Northern California. It shows that 42 of the 45 carried Beech-Nut. On the other hand, 23 of these 45 chains had discontinued Heinz and 6 or 7 had never carried Heinz. (SM 59–60)

32. The defendant maintains that Beech-Nut was sold only in a small percentage of the retail grocery outlets in California.

Beech-Nut contends that by the summer of 1957, Beech-Nut's entire baby food line had been discontinued in some of its most important outlets, wholesale and retail, in both Northern and Southern California. Complaints of slow movement reportedly came from nearly every major supermarket chain in California which carried Beech-Nut's baby foods. The President of Beech-Nut stated that the California representatives of Beech-Nut reported that if these outlets were lost, Beech-Nut would be finished as a baby food competitor in California. (Jordan affidavit, ¶ 8)

33. The plaintiff asserts that the decision to lower prices was made by the Beech-Nut executives who knew nothing about the baby food business and was opposed by those experienced in the business who were consulted about it. (SM 69)

34. The plaintiff further maintains that letters from Beech-Nut's salesman and broker in Northern California to its executives in New York indicate that Beech-Nut was attempting to obtain the Safeway and Purity accounts in Northern California. (SM 79–83)

V. The Price War In California

35. Prior to September 4, 1957, the prices of baby foods in California were as follows:

|  | Strained Baby Foods | Junior Baby Foods |
| --- | --- | --- |
| Gerber (tin) | $ .96 (per dozen) | $1.16½ |
| Heinz and Beech-Nut (glass) | $1.11 | $1.59 |

(Jordan affidavit, ¶ 10)

36. On September 4, 1957, Beech-Nut reduced its prices in glass to the same level as Gerber in tin—$.96 and $1.16½. On the following day, Heinz reduced its prices to the same level. (Jordan affidavit, ¶ 10)

37. On October 11, 1957, Gerber reduced its prices on strained baby foods and junior baby foods *in tin* from $.96 and $1.16½ respectively to $.86 and $.95½. Beech-Nut immediately followed suit, reducing its glass price to $.86 and $.95½. This represented reductions of $.25 and $.63½ from the pre-September 4th price levels. (SM 63)

38. On May 26, 1958, Gerber raised its prices to the pre-October 11, 1957 level —$.96 and $1.16½. Beech-Nut and Heinz immediately followed. On October 13, 1958, Beech-Nut raised its prices to $1.06 and $1.46½ and Heinz immediately followed. Gerber's corresponding prices remained at $.96 and $1.16½. That is the current price differential. (Jordan affidavit, ¶ 12)

39. The Gerber junior baby food in tin in California is in a 6½ ounce tin. Heinz and Beech-Nut junior baby food in glass sell in 7¾ ounce jars in California. (SM 53)

40. The price cut of Beech-Nut was accompanied by an allowance of $50 to new stores. In addition to rebating to the wholesalers the difference between

the new price and the old price of the wholesalers' stocks, Beech-Nut also rebated to all the retailers the difference in price on the shelf stocks. (SM 97, 98)

41. Beech-Nut conducted a "saturation" advertising campaign to advertise what it described as a "drastic" price reduction. The advertisements featured the phrase "permanent price reductions." (SM 98–102)

42. A number of computations and estimates made by the defendant relative to profit and loss are cited by the plaintiff as bearing upon the intent manifested by Beech-Nut in making the price reduction:

(a) In one document, Beech-Nut assumed an increase from 7% to 30% of the California market.

Beech-Nut assumed to find a market for an additional 7 million dozen jars of baby food.

(b) A cost summary prepared by Beech-Nut's accountants, dated October 29, 1957, indicated an annual loss of $400,000, and regardless of the California market, no reasonable profit.

(c) On November 7, 1957, Beech-Nut estimated that its losses for the last quarter of 1957 would be $300,000, or at the rate of $1.2 million a year.

(d) A budget for California for the year 1958, dated January 8, 1958, estimated that Beech-Nut's sales in 1958 would be approximately 2.4 million. (Previous sales in California had not exceeded $1.6 million.) The projected loss for the year 1958 was $767,000. (SM 122–126)

43. The actual sales figures for Beech-Nut for the first six months of 1958 were $1.3 million ($2.6 million annually), with a loss of $584,000 ($1,150,000 annually). (SM 126)

## VI.  Results Of The Price Cuts

44. The Vice-President of Western Operations of Gerber testified in substance that Heinz had to meet the Beech-Nut price cut or it would not survive in the market. (SM 131)

45. The defendant maintains that the President of Heinz stated that his company had ample reserves to fight a price war and had stronger business motivations to stay in the California market than Beech-Nut. (SM 15, 16)

46. Heinz' profits in the sale of baby foods in the United States were $1.5 million a year in the two years preceding the price war. In California, during the year of the price war, Heinz lost more money than it made in the rest of the United States, resulting in a net loss for the United States operations. (SM 131, 132)

47. Heinz brought this suit within four months of the start of the price war.

48. The immediate effect of the 1957 price changes was that Heinz and Beech-Nut each gained substantially in market shares as against Gerber. Gerber's share of the market for the twelve months following the reduction declined from approximately 76% to 63%. Since the price increases by Heinz and Beech-Nut in October 1953, Gerber's share has risen to approximately 70%, with Heinz at a little over 20% and Beech-Nut less than 10%. (Jordan affidavit, ¶¶ 13, 14)

### Discussion

█ The motion of the defendant for summary judgment will be considered on its merits. Although possibly ill-timed, having been made on the very eve of trial, the motion may well have the salutary effect of narrowing the issues for trial. The motion of the plaintiff for summary denial of defendant's motion for summary judgment is neither customary nor approved. See Welcher v. United States, D.C.E.D.Arkansas W.D. 1953, 14 F.R.D. 235, 237. The plaintiff's motion is, therefore, denied.

### Statute

The statute involved in this action is Section 2(a) of the Clayton Act, as amended, 15 U.S.C.A. § 13(a), which reads in pertinent part as follows:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchas-

460

ers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: * * *"

The present motion is addressed solely to the question whether there has been any violation of Section 2(a) of the Clayton Act. Issues relating to the affirmative defense and counterclaim are not here involved.

This is a so-called "primary line" case and does not involve any charge of "secondary line" injury. There is no allegation that the defendant sold at lower prices to one customer who was in competition with another. The competition involved is that between sellers and not between buyers.

*The Contentions Of The Parties*

The contention of the defendant is that a territorial or geographic price reduction in and of itself is not prohibited by Section 2(a), that such a reduction can constitute a violation only upon a showing that the probable effects are to injure competition, and that under the facts of this case there could be no finding that the defendant's price reductions posed any threat that competition in California would be lessened or injured.

After reviewing the cases, the defendant stated its position as follows: "We submit that the teaching of these authorities is that a local price cut which is uniform as among competing customers can violate the law only if (1) it was used aggressively and (2) it was used against weaker competitors. In the absence of either of these circumstances there is no basis for a finding that the competitive process will be injured." (Brief in support of defendant's motion for summary judgment, p. 17)

At the hearing on the motion, counsel for the plaintiff stated the position of the plaintiff as to the issues raised by the motion, as follows: "I assume the two issues of fact they raise in their motion are whether this was an aggressive price-cut and whether we were a stronger competitor in the sale of baby food. There is also the issue of fact * * * whether the facts show the probability of a substantial lessening of competition." (SM 134)

There is an area of agreement between the parties.

They agree that the relevant inquiry in a case of this type is the effect of the price cut on competition. The defendant avers that there is no mention of "competitors" in the statute, but, rather, "competition." It is the public interest that is being protected and not the private interest of any particular competitor. The defendant cites a quotation from a book by counsel for the plaintiff, William Simon, entitled, "Geographic Pricing Practices" (1950), where Mr. Simon stated: "The key word is 'competition.' * * * The statute does not —and it is not conceivable that Congress would—attempt to preserve the status quo of all competitors by making unlawful the natural effects of fair—even though vigorous—competition." (p. 301)

The plaintiff concurs in the view that the test is injury to competition but contends that, in the context of a given market, injury to a single competitor may constitute the statutory injury to competition. It alleges that such a market exists in the case of a highly concentrated industry where there are but few competitors in the marketplace.

The phrase "where the effect of such discrimination may be substantially to lessen competition" has been interpreted by the courts to require either a "reasonable possibility" or a "reasonable

probability" of injury to competition. The two terms seem to have been used somewhat interchangeably. Counsel for the parties do not raise any issue as to which term to apply (SM 8, 18) and agree that the question to be asked is, "Did that price-cut in California have a reasonable probability of substantially lessening competition?" (SM 19) [1]

For the purposes of this motion, the defendant does not question that a geographical price differential may result in a violation of the Clayton Act by reason of its effect on the primary level. In the case of Anheuser-Busch, Inc. v. Federal Trade Commission, 7 Cir., 1956, 265 F.2d 677, certiorari granted, 80 S.Ct. 151, 4 L.Ed.2d 117, the Seventh Circuit apparently held that a geographical price discrimination where there is no discrimination between competing customers cannot be a violation of Section 2(a). The defendant does not rely on that case, pointing out that even prior to the Robinson-Patman amendment, under the original Clayton Act of 1914 there could be a violation because of a geographical price differential at the primary level. See Porto Rican American Tobacco Co. of Porto Rico v. American Tobacco Co., 2 Cir., 1929, 30 F.2d 234.

*Issues*

The issues as defined by the parties, then, are:

A. The relative competitive strength of the parties.

B. The nature of the price decrease of the defendant in California.

C. Whether that price cut had a reasonable probability of substantially lessening competition.

A. The Relative Competitive Strength Of The Parties

The defendant asserts that the classical case of potential injury to competition is the one in which a well-financed national distributor cuts its price in an area where it has a weaker local competitor. A number of cases are cited to show that there is generally a great disparity in the relative economic strength of the two competitors. Porto Rican American Tobacco Co. of Porto Rico v. American Tobacco Company, 2 Cir., 1929, 30 F.2d 234; E. B. Muller & Co. v. Federal Trade Commission, 6 Cir., 1944, 142 F.2d 511; Moore v. Mead's Fine Bread Co., 1954, 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145.

It concludes that a territorial price reduction could not injure competition unless made against weaker competitors.

Under the facts of this case, where the three principal companies involved were large national companies with substantial sales, assets and surpluses, the defendant reasons that the statute has no applicability.

To support its position, Beech-Nut lists the market shares of each of the three companies, particularly in California, where it had less than 7% at the time of the price cut. The conclusion of the defendant is that if a price cut is used in a market where the competitors are of equal or substantially equal strength, there is no reason to suppose that normal competitive responses will not protect the competitive process.

The plaintiff denies that the companies are of substantially equal strength. It points to the fact that in the areas in which they compete, Beech-Nut outsells Heinz 2-to-1. Heinz disputes the relevance of total sales and asset figures. It emphasizes the fact that in 1957 Beech-Nut had a profit of over $8 million, while Heinz had a profit of $3 million. Of great significance to Heinz is the fact that before the price war Beech-Nut had "capital" of $25 million, while Heinz had a long-term funded indebtedness. In addition, Heinz was engaged solely in the food business, which had a low profit margin, while Beech-Nut obtained a high

1. See Corn Products Refining Co. v. Federal Trade Commission, 1945, 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320. A discussion of the use of the terms is contained in Atlas Building Products Co. v. Diamond Block & Gravel Co., 10 Cir., 1959, 269 F.2d 950, 957.

462

profit margin in the sale of gum and "Life Savers." Counsel for Heinz stated that "the wealth of a company in other materials, in other products, in other lines is not determinative of what you do in a particular line." (SM 33) In short, Heinz maintains that Beech-Nut was in a stronger competitive position than Heinz with a substantial "war chest" with which to fight a price war.

Heinz also cites the presence in the California market of other smaller competitors who would be hurt by a price war. Libby baby food had less than 2% of the market and was carried in only one chain store. Swift & Company had a fractional share of the market.

The plaintiff presented these facts in an attempt to show that the competitors were not of equal or substantially equal strength.

## B. The Nature Of The Price Decrease Of The Defendant In California

The defendant maintains that its price cut was a defensive measure employed because of its declining position in the sales market in California. It points to the decline from 9% in 1955 to 6.8% in 1957. It contends that the reduction was necessary to preserve its share of the market and prevent discontinuance of its baby food line in California by both retailers and wholesalers.

The position of the defendant is that where a territorial price cut threatens competition, it is because of its deliberate predatory use against a weaker competitor. The case of Balian Ice Cream Co. v. Arden Farms Co., 9 Cir., 1955, 231 F.2d 356, certiorari denied 1956, 350 U.S. 991, 76 S.Ct. 545, 100 L.Ed. 856 is cited as illustrating the fact that where a strong competitor makes local price cuts—even against weaker local competitors—there is no injury to competition if the price cut was made as a defensive response to local competitive conditions and not as an aggressive move against those local competitors.

The position of the plaintiff is that the price cuts of defendant were aggressive, not defensive. The defendant empha-

sizes the peculiar condition of the market wherein most retailers carried only one type of baby food in glass containers. Letters from Beech-Nut sales people and executives are exhibited to show the intent of Beech-Nut to eliminate Heinz from the market. The campaign by Beech-Nut to obtain the Safeway and Purity accounts, the documents prepared by Beech-Nut showing an expectation of greatly increased sales figures, the second price cut of October 11, 1957, at a time when Beech-Nut's sales had increased due to the first price cut, the advertising featuring "permanent price reductions" and the rebates to the retailers are all urged by the plaintiff to show the aggressive nature of the cut.

Any contention by Beech-Nut that the lower price of September 4, 1957 was only to eliminate the price differential between Beech-Nut and Gerber is countered by the plaintiff's statement that the Gerber price was for tin while Beech-Nut sold in glass. The plaintiff asserts that glass is a superior container and was preferred by housewives. Beech-Nut reduced its prices to a level where they lost money on every jar of baby food sold. The position of the plaintiff, hence, is that this was a predatory price cut against weaker competitors.

## C. The Probability Of A Substantial Lessening Of Competition

The defendant contends that, under the facts of this case, at no time could there have existed any probability of a substantial lessening of competition. It maintains that with a company of the size and strength of Heinz, with the business investment that Heinz had in the California market, Heinz had no alternative but to meet the price reduction. In answering the question of when the competitive situation should be examined to determine the probability of injury, counsel for Beech-Nut conceded that the test should be applied at the time of the price cut but that subsequent events as ultimately developing should be considered. Counsel suggested that the normal business reaction for Heinz would be ex-

actly what it was—a meeting of the price to protect its position.

The position of the plaintiff is that the reaction of Heinz, a weaker competitor, to this aggressive price cut could not be so easily determined. Counsel for Heinz contends that this is evident in that the Beech-Nut officials miscalculated Heinz' intent. The withdrawal of Clapp and Campbell from the California baby food market shows that withdrawal from the market is not unprecedented. The wealth of Heinz in other lines may not have been continued to be allocated to the baby food products line to support a losing fight. Heinz operated in a low profit field and had no large capital surplus and no high profit products to bear the loss. The plaintiff also points to the fact that Beech-Nut succeeded in taking the Purity account away from Libby. The plaintiff thus concludes that there was a probability of a substantial lessening of competition resulting from the price cut.

In the brief in support of the motion for summary judgment, counsel for defendant state: "Aside from the foregoing analysis we should also point out to the Court that so far as we are aware there has been no case with facts even remotely similar to the present case where a finding of injury to competition has been made." (p. 20) The research of this court has not resulted in the discovery of a case with an identic fact pattern—a suit by one large national company against another of apparently equivalent size—for price discrimination. However, in each instance, to determine validity, resort must be had to the statute and the intent of its framers.

█ The Court of Appeals for the Second Circuit recently commented on the legislative purpose of the Act as follows: "It is evident from the legislative history that Congress sought to curtail the concentration of economic power in the distributive area of the economy by eliminating inequalities derived from sheer economic power, while at the same time not stifling competition based on real cost savings and increased efficiency. H.R.Rep. No. 2287, 74th Cong., 2d Sess.

6–7; Sen.Rep. No. 1502, 74th Cong., 2d Sess. 3. See also F.T.C., Final Report on the Chain Store Investigation (1934); Sen.Res. 224, 70th Cong., 1st Sess., 69 Cong.Rec. 7857 (1928). * * *" Standard Motor Products, Inc. v. F. T. C., 2 Cir., 1959, 265 F.2d 674, 676. There has been no claim asserted here that the price differential was based on real cost savings or increased efficiency.

In a recent book, The Price Discrimination Law by Corwin D. Edwards, Brookings Institution, 1959, the author, citing to the House Judiciary Committee Report, sets forth the legislative objectives as follows: " * * * the general object was 'to suppress more effectually discriminations between customers of the same seller not supported by sound economic differences in their business positions or in the cost of serving them.' It decried discriminations 'in excess of sound economic differences between the customers concerned,' on the ground that they involve losses that must be recouped from the business of other customers. * * *" (p. 29)

In this case, the losses of Beech-Nut in the sale of baby foods in California might very well ultimately be recouped in some measure at least by the sale of baby foods east of the Mississippi.

In National Nut Co. of California v. Kelling Nut Co., D.C.N.D.Ill.E.D.1945, 61 F.Supp. 76, the court commented: "But a practice of underselling plaintiff in certain territory where plaintiff has an established business and maintaining a higher level of prices in other localities where competition with plaintiff or other companies is not so keen is a practice condemned by the anti-trust laws." (At page 81) In this case, the defendant enjoyed a market dominance in New York, where it had 50% of the baby food market and could use revenue from that market to undersell the plaintiff in California.

█ The contention of the plaintiff that, although the statutory test is injury to competition, in a given market injury to a single competitor may constitute the requisite competitive injury,

is a valid one. See Atlas Building Products Co. v. Diamond Block & Gravel Co., 10 Cir., 1959, 269 F.2d 950, where the court stated: "Antitrust legislation is concerned primarily with the health of the competitive process, not with the individual competitor who must sink or swim in competitive enterprise. But as a necessary incident thereto, it is concerned with predatory price cutting which has the effect of eliminating or crippling a competitor. For, surely there is no more effective means of lessening competition or creating monopolies than the debilitation of a competitor." (At page 954) See also Edwards, The Price Discrimination Law, Brookings Institution, 1959, p. 30.

To estimate the probability of a substantial lessening of competition only by the final result here—the savings by the California public during the price war and the resumption by the three major competitors of approximately the same market percentage as before—and thereby hold that the defendant committed no violation, would not effectuate the purposes of the Act. The situation must be looked at as it existed at the time of the cut. The small savings of the housewives during the period of the price war are of little consequence as compared to the possibility of the elimination from the market of one of only three major competitors in the baby food market, leaving only one major supplier of baby foods in glass. Whether that probability existed is the crux of this case.

In addition, although there is evidence presented as to the market percentages of the parties as of the date of trial, there has been little or no evidence presented bearing on possible market shifts between the parties immediately after the price cuts and none showing the respective positions of the competitors during the entire period in question.

The fact that there was a substantial increase in the total volume of baby food sales at the lower prices has little relevance in assessing injury to competition when, according to the plaintiff, each jar sold resulted in a further loss of money.

▪ The defendant urges as a principle of law that "a territorial price reduction does not injure competition within the meaning of Section 2(a) of the Clayton Act unless made aggressively against weaker competitors." (Brief, p. 10) Phrasing this conclusion in an affirmative manner, it would appear that the defendant concedes that such a reduction would injure competition if made aggressively against weaker competitors. This would seem to be an accurate statement of law. See Moore v. Mead's Fine Bread Co., 1954, 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145; Maryland Baking Co. v. Federal Trade Commission, 4 Cir., 1957, 243 F.2d 716.

The importance of the size and power of the parties involved was affirmed in the recent case of Atlas Building Products Co. v. Diamond Block & Gravel Co., 10 Cir., 1959, 269 F.2d 950. The court stated: "It was not error, therefore, for the trial court to instruct the jury that in determining the tendency of the price discriminations to substantially lessen competition and create a monopoly, they could consider the size of the appellant, its economic power and its comparative prices to purchasers in the El Paso and Las Cruces areas." (At pages 956–957)

Undue emphasis appears to be placed by the defendant on the fact that the plaintiff is also a nationwide competitor of substantial size. A competitor might sell on a nationwide basis and still be weaker. Price cutting in a specified area on a chosen battlefield in an attempt to drive a weaker competitor from that market could still substantially lessen competition in that market even if the injured party sold on a nationwide basis.

It is because much more than "the slightest doubt" exists as to the facts of the relative strength of the parties and the aggressiveness or lack of same of the price cut that this motion by the defendant for summary judgment must be denied. See Doehler Metal Furniture Co. v. United States, 2 Cir., 1945, 149 F.2d

130; Subin v. Goldsmith, 2 Cir., 1955, 224 F.2d 753.

As already indicated, there appears to be little dispute as to most of the underlying facts in this case. However, the inferences and conclusions to be drawn therefrom are disputed. Therefore, it might be questioned whether this is a proper case for summary judgment. The statements of Judge Edward Weinfeld of this court on a motion for summary judgment in United States v. Bethlehem Steel Corp., D.C.S.D.N.Y.1958, 157 F.Supp. 877, seem particularly apt. "I am persuaded that a decision after trial will be the more desirable procedure in the matter. It will serve to bring into sharper focus certain issues of importance which have been obscured by the voluminous affidavits with their statements, counter-statements and alternative positions, and the conflicting conclusions which the parties contend are to be drawn from the multitude of facts and statistics presented. Under all the circumstances the application of the summary judgment rule is questionable and the Court deems it sound judicial administration to permit a trial for such additional evidence and clarification as may be relevant." (At page 879) See also Kennedy v. Silas Mason Co., 1948, 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347.

There is also a genuine issue of fact as to the nature of the price cut. Although an *intent* to injure competition is not required by the statute, such an intent is often cited by the courts in the finding of a probable injury to competition. See Moore v. Mead's Fine Bread Co., 1954, 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145; Balian Ice Cream Co. v. Arden Farms Co., 9 Cir., 1955, 231 F.2d 356, certiorari denied 1956, 350 U.S. 991, 76 S.Ct. 545, 100 L.Ed. 856.

In the Balian case, relied on by the defendant, the trial court found that the price reduction of the defendant was made to combat improper rebates and special concessions made by competitors (D.C., 104 F.Supp. 796).

In addition, the trial court in the Balian case expressly found that the price differential did not substantially lessen competition or tend to create a monopoly.[2]

The question of intent or good faith on the part of Beech-Nut may have its greatest relevance in the affirmative defense of a lower price made in good faith to meet an equally low price of a competitor set forth in Section 2(b) of the Act. 15 U.S.C.A. § 13(b). The availability of that defense is not before this court for the purposes of this motion. In that connection, however, see Standard Motor Products, Inc. v. Federal Trade Commission, 2 Cir., 1959, 265 F.2d 674. "Moreover, it is well settled that a lowered price is within § 2(b) only if it is made in response to an individual competitive demand, and not as part of the seller's pricing system, [citations omitted] and only if it is used defensively to hold customers rather than to gain new ones." (265 F.2d at page 677)

In any event, determination of the alleged aggressive nature of the price cut is not a subject which lends itself to the summary judgment procedure. Proof of the purported intent of Beech-Nut will involve a question of credibility. See Arnstein v. Porter, 2 Cir., 1946, 154 F.2d 464; Alvado v. General Motors Corp., 2 Cir., 1956, 229 F.2d 408, certiorari denied 1956, 351 U.S. 983, 76 S.Ct. 1050, 100 L.Ed. 1497.

In short, genuine issues of fact exist as to two essential elements in the case—the relative competitive strength

---

2. Although this was a so-called "primary line" case, note the following statements in the opinion of the Court of Appeals for the Ninth Circuit: "There was absolutely no evidence in the record that the differentials as to sales in commerce or in other areas had any relation to any injury or damage which plaintiffs may have sustained. * * * The customers of Arden in the respective areas are not in competition with each other, and the products sold in each area are sold in competition with like products manufactured by others." (231 F.2d at page 367)

of the parties and the nature of the price cut. These issues must be resolved before the question whether the probable effect of the price discrimination might have been a substantial lessening of competition can be answered.

Under these circumstances, this court must heed the repeated admonitions of the Court of Appeals for this Circuit and deny the motion of the defendant for summary judgment. Doehler Metal Furniture Co. v. United States, 2 Cir., 1945, 149 F.2d 130; Arnstein v. Porter, 2 Cir., 1946, 154 F.2d 464. See also Purofied Down Products Corp. v. Travelers Fire Ins. Co., D.C.S.D.N.Y.1959, 171 F.Supp. 399; Harris v. Fawcett Publications, Inc., D.C.S.D.N.Y.1959, 176 F.Supp. 390.

Defendant's motion for summary judgment is denied.

So ordered.